*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 11a0251p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

BIO-MEDICAL APPLICATIONS OF TENNESSEE,
INC., Individually and as assignee of Patient,
dba BMA of Kingsport,
　　　　　*Plaintiff-Appellee/Cross-Appellant,*

　　　　*v.*

CENTRAL STATES SOUTHEAST AND
SOUTHWEST AREAS HEALTH AND WELFARE
FUND,
　　　　　*Defendant-Appellant/Cross-Appellee.*

Nos. 09-6121/6169

———————————

Appeal from the United States District Court
for the Eastern District of Tennessee at Greeneville.
No. 08-00228—Robert Leon Jordan, District Judge.

Argued: January 11, 2011

Decided and Filed: September 2, 2011

Before: MERRITT, COOK, and WHITE, Circuit Judges.

———————————

## COUNSEL

**ARGUED:** Edward H. Bogle, CENTRAL STATES FUNDS LAW DEPARTMENT,
Rosemont, Illinois, for Appellant. James F. Bennett, DOWD BENNETT, LLP, Clayton,
Missouri, for Appellee. **ON BRIEF:** Edward H. Bogle, James P. Condon, CENTRAL
STATES FUNDS LAW DEPARTMENT, Rosemont, Illinois, for Appellant. James F.
Bennett, DOWD BENNETT, LLP, Clayton, Missouri, Douglas T. Gibson, THE
GIBSON FIRM LLC, Marietta, Georgia, for Appellee.

　　　MERRITT, J., delivered the opinion of the court, in which COOK, J., joined.
WHITE, J. (pp. 31–34), delivered a separate concurring opinion.

1

---

## OPINION

---

MERRITT, Circuit Judge. Medicare costs are rising. In 1980, Congress enacted the Medicare Secondary Payer Act (the "Act") to counteract the growth of these costs. Before the Act, Medicare paid for all medical treatment within its scope and left private insurers merely to pick up whatever expenses remained. The Act inverted that system; it made private insurers covering the same treatment the "primary" payers and Medicare the "secondary" payer. This case involves the proper construction of the Act. At stake is who should bear the cost of kidney dialysis treatment — private insurers, healthcare providers, or Medicare — and the proportionate responsibility of each.

Three questions are presented. First, can a "group health plan" (a type of private insurer employers often use) immediately deny coverage to one of its insureds simply because that person became eligible for Medicare after being diagnosed with end-stage renal disease (a chronic kidney disease)? Looking to the text and purpose of the Act, we hold that a group health plan cannot.[1]

Second, when a group health plan violates the Act, what is the remedy for injured healthcare providers like plaintiff? If the "group health plan" fails to pay a provider "promptly," then Medicare can step in and make a temporary payment on behalf of the delinquent private insurer.[2] For this situation, the Act also contains a private cause of action that permits a private party, such as a healthcare provider, to sue the private

---

[1] The statutory language is fairly clearly stated in paragraph 1 of the Act: "A group health plan . . . may not take into account that an individual is entitled to or eligible for [Medicare benefits due to end-stage renal disease] during the [30]-month period which begins with the first month in which the individual becomes entitled to benefits . . . ." 42 U.S.C. § 1395y(b)(1)(C)(i).

[2] Paragraph 2(A) of the Act describes Medicare's role using the following language (which, although not immediately clear, can be readily understood in context): "Payment under this subchapter may not be made [by Medicare], except as provided in subparagraph (B) [which permits Medicare to pay temporarily when a group health plan has not paid promptly], with respect to any item or service to the extent that — (i) payment has been made, or can reasonably be expected to be made, [by a group health plan] . . . as required under paragraph (1)." *Id.* § 1395y(b)(2)(A).

insurer.[3]  Pointing to a different provision in this convoluted statute, several federal courts (including the district court below in this case) have held that in order for a private insurer to be liable under the private cause of action, the private insurer's responsibility to pay must also be "demonstrated" (e.g., via a prior judgment or settlement) prior to the litigation.[4]  Some of those courts found that an existing contract for the insurer to pay the provider is insufficient.  We reject that interpretation.  After engaging in a close reading of the Act's tortuous text and studying its amendment history, we believe that the Act's "demonstrated responsibility" provision serves as a limitation only in a very specific situation:  when Medicare seeks reimbursement for medical expenses caused by tortfeasors.  Thus, we hold that a healthcare provider need not previously "demonstrate" a private insurer's responsibility to pay before bringing a lawsuit under the Act's private cause of action.

Third, what is the proper amount of damages under the Act's private cause of action?  The private cause of action establishes damages "which shall be in an amount double the amount otherwise provided," 42 U.S.C. § 1395y(b)(3)(A), but nowhere does the Act "otherwise provide" for the proper reference point for the doubling.  Should double damages equal twice the amount the healthcare provider would have received from the private insurer, or twice the amount that Medicare conditionally paid the healthcare provider?  We believe that double damages serve two purposes:  First, much like treble damages in the antitrust laws, they punish and deter disfavored conduct — here, the shifting of costs from private insurers to Medicare.  Second, double damages provide a needed incentive for healthcare providers to bring lawsuits to vindicate

---

[3] The nature of the private cause of action is less clear and is complicated by the need to determine how the two "paragraphs" it references may be satisfied:  "There is established a private cause of action for damages (which shall be in an amount double the amount otherwise provided) in the case of a primary plan which fails to provide for primary payment (or appropriate reimbursement) in accordance with paragraphs (1) and (2)(A)."  *Id.* § 1395y(b)(3)(A).

[4] The "demonstrated responsibility" provision is the least clear of all.  It reads:  "A primary plan, and an entity that receives payment from a primary plan, shall reimburse [Medicare] for any payment made by [Medicare] under this subchapter with respect to an item or service *if it is demonstrated* that such primary plan has or had a responsibility to make payment with respect to such item or service.  A primary plan's responsibility for such payment may be demonstrated by a judgment, a payment conditioned upon the recipient's compromise, waiver, or release (whether or not there is a determination or admission of liability) of payment for items or services included in a claim against the primary plan or the primary plan's insured, *or by other means*."  *Id.* § 1395y(b)(2)(B)(ii) (emphasis added).

Medicare's interests; the Act enables Medicare to share in the proceeds by bringing its own lawsuit. On this third issue, however, we choose to remand to the district court due to a paucity of briefing on the relevant facts and law.

Accordingly, for reasons explained more fully below, we **AFFIRM** the district court's judgment as to the first question, we **REVERSE** as to the second question, and we **REMAND** as to the third question for further proceedings consistent with this opinion.

## I. Factual and Procedural Background

The facts in this case are simple and undisputed. Central States provides health insurance to workers, retirees, and their dependents. Bio-Medical operates kidney dialysis centers. In August 2005, a patient who was insured by Central States was diagnosed with end-stage renal disease and immediately began receiving dialysis treatment at one of Bio-Medical's centers. The patient assigned her rights under the insurance plan to Bio-Medical, which submitted to Central States its bills for the cost of this treatment. Central States initially paid Bio-Medical for the treatment.

On November 1, 2005, three months after the patient was diagnosed with end-stage renal disease, the patient became entitled to Medicare benefits. *See* 42 U.S.C. § 426-1. Her insurance plan provided that her coverage ceased at that time, specifically because of her entitlement to Medicare. The plan states: "Coverage under this Plan shall terminate on the earliest of the following dates: . . . (b) the date [the insured] first becomes entitled to Medicare benefits . . . ." Central States, however, did not yet realize that the patient was entitled to Medicare benefits, so it continued to pay Bio-Medical for the patient's dialysis treatment for two more months.

In January 2006, Central States discovered that the patient was entitled to Medicare benefits. In spite of the "may-not-take-into-account-Medicare-benefits" language of the Medicare Secondary Payer Act, recited in footnote 1 above, Central States immediately terminated her coverage. Bio-Medical informed Central States of its belief that Central States was not legally permitted to terminate coverage due to a

patient's entitlement to Medicare benefits. Bio-Medical continued to treat the patient and bill Central States, but Central States refused to make any further payments. Additionally, Central States declared that its termination of the patient's coverage was retroactive to November 1, 2005 — the date on which the patient became entitled to Medicare benefits — and that Central States, therefore, had overpaid Bio-Medical in an amount of approximately $25,600 for the previous two months of treatment. Central States recovered all but about $4,000 of the alleged overpayment by offsetting it against amounts to be paid on other patients' accounts.

The patient died on May 18, 2006. Bio-Medical continued to provide her dialysis treatment until her death. Although Bio-Medical continued to bill Central States for the treatment, Central States made no further payments to Bio-Medical. Bio-Medical alleges that the outstanding balance of its bills to Central States — which span from November 1, 2005, to May 18, 2006 — is approximately $210,000. Bio-Medical, however, did receive some payment for the patient's treatment: after being rebuffed by Central States, Bio-Medical billed Medicare, which paid Bio-Medical an amount that is undisclosed in the record. Bio-Medical alleges that the amount it received from Medicare is less than what it would have received from Central States.

Bio-Medical challenged Central States' decision to deny coverage through Central States' internal appeals process (to no avail) and then filed the instant lawsuit. Bio-Medical asserted two distinct claims under the same basic theory: (1) an ERISA claim, under 29 U.S.C. § 1132(a)(1)(B), for unpaid benefits under the patient's insurance policy that Bio-Medical, as her assignee, had the right to recover; and (2) a private cause of action for double damages under the Medicare Secondary Payer Act, 42 U.S.C. § 1395y(b)(3)(A), for Central States' violation of that statute.

The district court granted summary judgment to Bio-Medical on its ERISA claim. By denying coverage due to the patient's entitlement to Medicare benefits, the district court explained, Central States violated the Act's prohibition against insurers "taking into account" an insured's eligibility for Medicare due to end-stage renal disease. But the district court granted Central States' motion to dismiss Bio-Medical's claim

under the Act's private cause of action. Relying on a string of federal cases, the district court reasoned that a necessary precondition to a lawsuit under the private cause of action for double damages was that the defendant's responsibility to pay must have been previously "demonstrated" before the filing of the claim, and that Central States' responsibility to pay had not yet been so "demonstrated" or established in this case.

Both parties timely appealed. Central States appeals the district court's grant of summary judgment to Bio-Medical on the ERISA claim, and Bio-Medical cross appeals the district court's dismissal of its claim for double damages under the Act's private cause of action.

## II. ERISA Claim: Whether the Medicare Secondary Payer Act Prevents Private Insurers from Terminating an Insured's Coverage Due to His Entitlement to Medicare Benefits[5]

Medicare, a federal health-insurance program, provides health-insurance benefits to people sixty-five years of age or older, disabled people, and people with end-stage renal disease. *Stalley v. Methodist Healthcare*, 517 F.3d 911, 915 (6th Cir. 2008) (citing 42 U.S.C. § 1395c). For many years, Medicare served as the primary payer of health costs for eligible individuals, but in 1980 Congress enacted the Medicare Secondary Payer Act to counteract escalating healthcare costs. *Id.* (citing 42 U.S.C § 1395y(b)). To this end, when both Medicare and a private plan would cover a Medicare beneficiary's expenses, the Act makes Medicare the "secondary" payer and the private plan the "primary" payer. *Id.* The primary payer is responsible for paying for the patient's medical treatment; however, if Medicare expects that the primary payer will not pay promptly, then Medicare can make a "conditional payment" on its behalf and later seek reimbursement. *Id.* It would appear that the precise problem that Congress sought

---

[5]A word on the standard of review. The parties agree that we must review the plan administrator's decision to deny benefits under the arbitrary-and-capricious standard because the plan expressly grants the plan administrator discretionary authority to determine eligibility for benefits and construe the terms of the plan. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). As the district court correctly observed, however, a plan administrator's decision to deny benefits will necessarily be arbitrary and capricious if adherence to a plan provision results in a violation of federal law, as interpreted by this Court. *See Dist. 2, United Mine Workers of Am. v. Helen Mining Co.*, 762 F.2d 1155, 1160 (3d Cir. 1985); *cf. Benefits Comm. of Saint-Grobain Corp. v. Key Trust Co. of Ohio*, 313 F.3d 919, 925 (6th Cir. 2002) (applying de novo review when "only questions of law are involved").

to ameliorate was that private plans would provide inferior benefits or coverage for medical treatment that also was covered by Medicare.

To implement this system, the Act prevents a "group health plan" from taking two actions with respect to an individual afflicted with end-stage renal disease:

> A group health plan . . . —
>
> (i) may not *take into account* that an individual is entitled to or eligible for [Medicare benefits due to end-stage renal disease] during the [30]-month period which begins with the first month in which the individual becomes entitled to benefits . . . ; and
>
> (ii) may not *differentiate* in the benefits it provides between individuals having end stage renal disease and other individuals covered by such plan on the basis of the existence of end stage renal disease, the need for renal dialysis, or in any other manner . . . .

42 U.S.C. § 1395y(b)(1)(C) (emphasis added). The district court, deferring to agency regulations, held that Central States violated both prohibitions when it terminated the patient's coverage. We conclude that Central States violated the first provision and therefore need not address the second.

A group health plan impermissibly "takes into account" that an individual is entitled to Medicare benefits due to end-stage renal disease when it terminates coverage for that reason. "A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Perrin v. United States*, 444 U.S. 37, 42 (1979). "Take into account" (which is not defined elsewhere), then, essentially means "consider": group health plans cannot *consider* the fact that an insured person is also covered by Medicare. This formulation may be broad, but we need not determine the outer contours of its scope because the Act's purpose makes clear that it prohibits the termination of coverage due to entitlement to Medicare benefits. *Cf. Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006) ("Interpretation of a word or phrase depends upon reading the whole statutory text, considering the purpose and context of the statute."). The shifting of costs from private plans to the public fisc was exactly the evil that the Act sought to correct. *See Fanning*

*v. United States*, 346 F.3d 386, 388 (3d Cir. 2003) ("The [Act] was designed to curb skyrocketing health costs and preserve the fiscal integrity of the Medicare system.").

Even if the statutory phrase "take into account" were ambiguous on the issue of the termination of coverage, a federal regulation interpreting the Act expressly forbids the termination of coverage due to Medicare entitlement. *See* 42 C.F.R. § 411.108(a)(3) (providing that one example of "taking into account" is "[t]erminating coverage because the individual has become entitled to Medicare"). This agency interpretation deserves deference if (1) Congress has not "directly spoken to the precise question at issue," and (2) the agency's interpretation is reasonable. *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-44 (1984). The interpretation is reasonable, of course, because it furthers the Act's goal of preventing private plans from shifting costs to Medicare. Accordingly, even if we assumed that Congress did not speak directly to this precise issue, we would defer to the agency's reasonable interpretation of the Act.

In defense of its decision to terminate coverage, Central States primarily argues for a supposed distinction between "benefits" and "coverage" that it purports to divine from the Act: to wit, that the Act prohibits the denial of benefits but permits the termination of coverage entirely. Central States contends that Congress's repeated use of the term "benefits" (rather than "coverage") in the Act was deliberate and signifies that Congress intended for insurers to be able to terminate coverage when a patient becomes eligible for Medicare.[6] Central States also argues that the use of the terms "primary" and "secondary" throughout the Act's provisions and in its title indicate that the Act is merely a "coordination of benefits" statute that only governs who must pay when there are multiple insurers. When Medicare is the sole insurer, Central States argues, Medicare must pay.

---

[6]There are several provisions to which Central States points for the use of the term "benefits." *See, e.g.*, 42 U.S.C. § 1395y(b)(1)(C)(i) ("A group health plan . . . may not take into account that an individual is entitled to or eligible for *benefits* . . . .) (emphasis added); *id.* § 1395y(b)(1)(A)(i)(I) (similar); *id.* § 1395y(b)(1)(B)(i) (similar); *id.* § 1395y(b)(1)(C)(ii) ("A group health plan . . . may not differentiate in the *benefits* it provides . . . .) (emphasis added).

Central States would have us completely emasculate the Act. If private plans could terminate coverage whenever a planholder became entitled to Medicare, then private plans often would do just that, thereby forcing Medicare to bear the full burden by itself. Medicare would not be the secondary payer; it would be the *only* payer. Moreover, the plain language of the Act does not support the purported distinction. The Act prohibits "tak[ing] into account that an individual is *entitled to* or eligible for benefits." 42 U.S.C. § 1395y(b)(1)(C)(i) (emphasis added). And as Central States conceded at oral argument, coverage entitles one to benefits. Accordingly, the Act specifically contemplates coverage as being synonymous with benefits. Put simply, by terminating the patient's coverage in this case, Central States denied all her benefits. That is precisely what the Act prohibits.

In a similar argument, Central States contends that the Act does not mandate that group health plans extend coverage to end-stage renal disease patients who are entitled to Medicare benefits. Central States relies primarily on *Blue Cross & Blue Shield of Texas, Inc. v. Shalala*, which held that a group health plan could terminate a planholder's "continuation" coverage when the planholder was diagnosed with end-stage renal disease and became entitled to Medicare benefits. 995 F.2d 70 (5th Cir. 1993). That case is inapposite. It resolved a conflict, not present here, between the Act's "taking into account" provision and a provision in the federal "continuation" coverage statute (popularly known as "COBRA," designed to provide for continuing insurance coverage arising from changes in employment), which expressly *permits* private plans to terminate "continuation" coverage when a COBRA planholder becomes entitled to Medicare benefits. *Id.* at 71 (citing 29 U.S.C. § 1162(2)(D)(ii)). Central States has not argued that it was providing the patient in this case with continuation coverage, nor can Central States point to any statute, like COBRA, that expressly permits it to terminate coverage. If a group health plan would provide coverage but for a planholder's entitlement to Medicare benefits, then the Act requires the plan to extend coverage to that planholder. *See Health Ins. Ass'n of Am., Inc. v. Shalala*, 23 F.3d 412, 414 & n.2 (D.C. Cir. 1994) ("The effect of [the Act] is to nullify any plan provision that would 'carve out' expenses

covered by Medicare and thus, in effect, make the plan's coverage secondary to Medicare's.").

Applying the law to this case, Central States violated the Act by terminating the patient's coverage. Central States does not contest that it qualifies as a group health plan under the Act. And it concedes that pursuant to the terms of its plan, it terminated the patient's coverage specifically because the patient became eligible for Medicare benefits due to her diagnosis with end-stage renal disease. This termination occurred during the thirty-month period after the patient's Medicare entitlement began — the time period during which the statute prohibits a group health plan from "taking into account" entitlement to Medicare benefits. *See* 42 U.S.C. § 1395y(b)(1)(C)(i). Thus, the plan provision terminating coverage for that reason is void for violating federal law, and Central States' decision to deny benefits is arbitrary and capricious for the same reason. As the plan beneficiary, Bio-Medical is entitled to payment from Central States for the treatment it provided from when the patient became entitled to Medicare benefits on November 1, 2005, until her death on May 18, 2006. Accordingly, we affirm the district court's grant of summary judgment in favor of Bio-Medical on Bio-Medical's ERISA claim.[7]

### III.  The Private Cause of Action in the Medicare Secondary Payer Act

In addition to its ERISA claim, Bio-Medical sued Central States under the Medicare Secondary Payer Act's private cause of action. *See* 42 U.S.C. § 1395y(b)(3)(A). Bio-Medical based this claim on the same violation of the Act discussed in Part II above:  that Central States improperly terminated the patient's coverage due to her entitlement to Medicare benefits. Even though the district court held that Central States violated the Act for this reason (and therefore granted summary

---

[7]One implication of our holding in favor of Bio-Medical on its ERISA claim is that we also must affirm the district court's dismissal of Central States' counterclaim. Central States paid Bio-Medical for approximately two months of the patient's treatment before realizing that the patient was entitled to Medicare benefits, and Central States later recovered all but approximately $4,000 of that amount (which it believed to be an overpayment). The counterclaim sought to recover that $4,000. Our holding that Central States was liable for the full cost of treatment, however, necessarily implies that Central States was contractually required to pay that $4,000 as part of the patient's treatment.

judgment to Bio-Medical on its ERISA claim), the district court dismissed Bio-Medical's claim under the private cause of action for failure to state a claim. For the following reasons, we reverse.[8]

## A. The Private Cause of Action and the Statutory Framework

The private cause of action in the Medicare Secondary Payer Act states in full: "[t]here is established a private cause of action for damages (which shall be in an amount double the amount otherwise provided) in the case of a primary plan which fails to provide for primary payment (or appropriate reimbursement) in accordance with paragraphs (1) and (2)(A)." 42 U.S.C. § 1395y(b)(3)(A). The reason why this provision is attractive to Bio-Medical is immediately obvious. Unlike the ERISA cause of action, which is essentially a contract claim and thus permits only single damages, this provision permits Bio-Medical to recover double damages. But a private party can recover under this provision only if a primary plan has failed to provide primary payment or appropriate reimbursement "in accordance with paragraphs (1) and (2)(A)." When does that occur?

To answer this question fully, it is first necessary to understand the Act's basic structure. The Act is comprised of eight sections, or "paragraphs,"[9] but only the first three are relevant here. Paragraph (1), entitled "[r]equirements of group health plans," essentially lays out a system of rules instructing when group health plans must pay for medical items and services. *See id.* § 1395y(b)(1). The first three subparagraphs of

---

[8]As a preliminary matter, Central States argues that Bio-Medical waived its right to argue on appeal that Central States' defense (the applicability of the Act's "demonstrated responsibility" provision, as discussed in detail in Part III.B, *infra*) does not apply because Bio-Medical did not provide a sufficiently fulsome rebuttal of that defense to the district court. In essence, Central States argues that Bio-Medical automatically must lose its appeal because it did not provide a sufficient argument below. This argument contorts the waiver doctrine far beyond its two policy goals: easing appellate review by having the district court first consider issues, and ensuring fairness to litigants by preventing surprise issues on appeal. *Rice v. Jefferson Pilot Fin. Ins. Co.*, 578 F.3d 450, 454 (6th Cir. 2009). The district court considered the applicability of the "demonstrated responsibility" provision (indeed, disposing of Bio-Medical's claim on that basis), and Central States cannot assert that it is surprised to have to defend the applicability of that provision on appeal. Accordingly, we hold that Bio-Medical did not waive its right to argue on appeal that the provision does not apply.

[9]Calling these sections "paragraphs" is a bit of a misnomer, as most of them are several pages long and involve layers of subparagraphs, sub-subparagraphs, etc. However, because the Act uses that terminology, we will adhere to it in this opinion.

paragraph (1) prevent group health plans from "taking into account" that a planholder is entitled to Medicare benefits due to being (a) at least sixty-five years old, (b) disabled, or (c) diagnosed with end-stage renal disease. (The third subparagraph, of course, is the subject of Part II above.) Paragraph (2), entitled "Medicare secondary payer," instructs when Medicare may or may not pay for medical items and services. It has two main subparagraphs. Subparagraph (2)(A) provides that Medicare may not pay when a primary plan is reasonably expected to pay under paragraph (1), "except as provided in subparagraph [2](B)." Subparagraph (2)(B), in turn, provides that when the Act requires a primary plan to pay for items or services but the primary plan "cannot reasonably be expected" to pay "promptly," then Medicare may make conditional payments for those items or services. Subparagraph (2)(B) expressly provides that these payments are "conditional," that the primary plan "shall reimburse" Medicare, and that Medicare can sue a delinquent primary plan for reimbursement. *See id.* § 1395y(b)(2)(B). Finally, paragraph (3), entitled "[e]nforcement," contains the private cause of action. *See id.* § 1395y(b)(3)(A); *see generally Shalala*, 23 F.3d at 414-15 (discussing the Act's structure).

When does a primary plan fail to make payment "in accordance with paragraphs (1) and (2)(A)"? Determining when a primary plan violates paragraph (1) is easy. A primary plan fails to pay under paragraph (1) by, among other things, "tak[ing] into account" that a planholder is entitled to Medicare benefits after being diagnosed with end-stage renal disease. *See* 42 U.S.C. § 1395y(b)(1)(C)(i). As discussed in Part II above, Central States did precisely that by terminating the patient's coverage because of her entitlement to Medicare benefits. But the private cause of action uses the conjunctive: it requires that the primary plan fail to make payment "in accordance with paragraphs (1) *and* (2)(A)." *Id.* § 1395y(b)(3)(A) (emphasis added). The private cause of action, therefore, also apparently requires us to determine when a primary plan fails to pay in accordance with subparagraph (2)(A).

The challenge with making this determination is that subparagraph (2)(A) only addresses Medicare — not primary plans — as its subject. As mentioned, the general

thrust of paragraph (2) is to instruct when Medicare may or may not pay for medical items and services; the responsibilities of primary plans are detailed in paragraph (1). Specifically, subparagraph (2)(A) provides, in relevant part: "[p]ayment under this subchapter may not be made, except as provided in subparagraph [2](B), with respect to any item or service to the extent that . . . payment has been made, or can reasonably be expected to be made, with respect to the item or service as required under paragraph (1)." *Id.* § 1395y(b)(2)(A). Although this provision contains two instances of passive voice, we can easily glean both implied subjects from the statutory context.[10] Rephrased in active voice for clarity, subparagraph (2)(A) states: *Medicare may not pay for any item or service, except as provided in subparagraph (2)(B), to the extent that the Act requires a primary plan to pay*. And subparagraph (2)(B) permits Medicare to pay conditionally for an item or service only if a primary plan that should pay "cannot reasonably be expected" to pay "promptly." Substituting that provision back into subparagraph (2)(A), we arrive at this freestanding formulation of subparagraph (2)(A): *Medicare may not pay for any item or service to the extent that the Act requires a primary plan to pay, except that Medicare may conditionally pay for the item or service if the primary plan cannot reasonably be expected to pay promptly*. In other words, when a primary plan must pay but will not do so promptly, Medicare may make a conditional payment.

How can a primary plan fail to make a payment in accordance with subparagraph (2)(A), if that subparagraph only instructs when *Medicare*, and not primary plans, may or may not make payments? The answer, of course, is that it cannot: it is impossible for one to violate an order addressed only to someone else. A primary plan can no more violate an order addressed only to Medicare than a soldier can violate an order addressed only to the members of a different platoon. But if a primary plan can never fail to pay in accordance with subparagraph (2)(A), and if a primary plan's violation of

---

[10] Regarding the first instance of passive voice ("[p]ayment under this subchapter may not be made . . . ."), the title of paragraph (2) ("Medicare secondary payer") and the statutory context confirm that the implied subject must be Medicare. Regarding the second instance of passive voice ("payment has been made . . . as required under paragraph (1)), the implied subject must be primary plans, because paragraph (1) instructs when primary plans must pay.

subparagraph (2)(A) is necessary for a party to prevail on the private cause of action, then the private cause of action is rendered inoperative. We must avoid such a construction of the Act if at all possible. *See United States v. Atl. Research Corp.*, 551 U.S. 128, 137 (2007) (stating that statutes should not be interpreted so as "to render [an] entire provision a nullity").

The solution is to consider paragraphs (1) and (2)(A) collectively, rather than individually. Paragraph (1) prevents primary plans from limiting a planholder's benefits or coverage simply because the planholder is entitled to Medicare benefits, and subparagraph (2)(A) instructs that when a primary plan violates that prohibition and accordingly fails to pay for treatment, Medicare may make a conditional payment for the treatment. Thus, a primary plan fails to pay "in accordance with paragraphs (1) and (2)(A)" when it terminates a planholder's coverage and thereby induces Medicare to make a conditional payment on its behalf — that is, when the primary plan violates the statutory system that these two paragraphs set into motion. Put differently, a primary plan is liable under the private cause of action when it discriminates against planholders on the basis of their Medicare eligibility and therefore causes Medicare to step in and (temporarily) foot the bill. Our interpretation, in addition to rendering operative all relevant statutory provisions, is eminently reasonable: it permits lawsuits against the primary plans that performed the precise actions that the Act condemns.

Applying our interpretation of the Act's text to this case, Central States is liable to Bio-Medical under the private cause of action. By terminating the patient's coverage due to her Medicare entitlement (in violation of the Act) and inducing Medicare to make a conditional payment to Bio-Medical, Central States "fail[ed] to provide for primary payment . . . in accordance with paragraphs (1) and (2)(A)." Although we believe that the Act's text alone compels this conclusion, we acknowledge that the convoluted nature of the statute permits a counterargument that is at least facially appealing: that in order to be liable under the Act's private cause of action, a primary plan's responsibility to pay must have already been "demonstrated" prior to the lawsuit. An opinion from the Eleventh Circuit first adopted this argument, which has now been repeated by several

federal district courts. Indeed, relying on this authority, the district court below dismissed Bio-Medical's claim under the Act's private cause of action. We will now address the error of this argument.

**B.     The "Demonstrated Responsibility" Provision in the Medicare Secondary Payer Act**

Central States argues that it cannot be liable under the private cause of action because its responsibility to pay had not yet been demonstrated prior to this litigation. The district court accepted this argument. Both Central States and the district court rely primarily on the reasoning of the Eleventh Circuit in *Glover v. Liggett Group, Inc.*, 459 F.3d 1304 (11th Cir. 2006), which considered when a tortfeasor — not a group health plan — may be liable under the Act's private cause of action. (Due to a quirk in the Act's history, as discussed in greater detail below, tortfeasors now counter-intuitively fall within the Act's definition of a "primary plan.") The *Glover* case, in turn, based its holding on the Act's "demonstrated responsibility" provision, which states in pertinent part: "A primary plan . . . shall reimburse [Medicare] for any payment made by [Medicare] . . . with respect to an item or service if it is demonstrated that such primary plan has or had a responsibility to make payment with respect to such item or service," 42 U.S.C. § 1395y(b)(2)(B)(ii).

**1.     The Reasoning in the *Glover* Case and the Unanswered Questions It Raises**

The facts and procedural history in *Glover* are relatively simple. Two individuals filed a lawsuit against two major tobacco companies under the Medicare Secondary Payer Act's private cause of action. 459 F.3d at 1306-07. The plaintiffs, seeking to act as "private attorneys general," sued "to recover for the Medicare program all the expenditures it made [over an eight-year period] for health care services rendered in the State of Florida to Medicare beneficiaries for the treatment of diseases attributable to cigarette smoking." *Id.* at 1307. In other words, the plaintiffs sought first to use the Act to establish the tobacco companies' state-law tort liability for battery and, then, to recover reimbursement for payments made by Medicare. *Id.* Notably, the plaintiffs did not allege that the tobacco companies caused them any personal harm: they did not

allege that they were smokers themselves, or that the defendants' refusal to pay for medical treatment forced them to foot the bill. After the district court dismissed their lawsuit for failure to state a claim, the Eleventh Circuit affirmed, citing both the "demonstrated responsibility" provision and a fear that a contrary holding would greatly expand federal jurisdiction over state-law tort cases. *Id.* at 1308-09.

It is the *Glover* opinion's discussion of the "demonstrated responsibility" provision that has precipitated the current state of the law. Its reasoning arose from a valiant attempt to make sense of the conjunction in the Act's private cause of action, which creates liability against primary plans who fail to pay for treatment "in accordance with paragraphs (1) and (2)(A)." *Id.* § 1395y(b)(3)(A). But as discussed above in Part III.A, a primary plan cannot violate subparagraph (2)(A), which is addressed exclusively to Medicare, not to primary plans. Rather than digging this deeply into the statute, however, the *Glover* case reasoned that subparagraph (2)(A) mentions subparagraph (2)(B), that buried within subparagraph (2)(B) is sub-subparagraph (2)(B)(ii), and that sub-subparagraph (2)(B)(ii) places a condition on when a primary plan must reimburse Medicare for a conditional payment made by Medicare: a primary plan must reimburse Medicare only if its responsibility to pay for the treatment has already been demonstrated. *See Glover*, 459 F.3d at 1308-09. Accordingly, the *Glover* case reasoned, a primary plan cannot "fail" to pay "in accordance with paragraph[] . . . (2)(A)" — and, thus, cannot be liable under the private cause of action — unless its responsibility to pay for the treatment has been demonstrated prior to the litigation. *Id.* at 1308-09. As for how a primary plan's responsibility must be demonstrated, *Glover* pointed to the next sentence of sub-subparagraph (2)(B)(ii): "A primary plan's responsibility . . . may be demonstrated by a judgment, a payment conditioned upon the recipient's compromise, waiver, or release (whether or not there is a determination or admission of liability) of payment for items or services included in a claim against the primary plan or the primary plan's insured, or by other means."

This reasoning raises several questions, all left unanswered. First, why would Congress include a private cause of action within a statutory scheme but then limit its

use to situations in which the defendant's liability has already been legally demonstrated? Assuming that a primary plan's responsibility to pay is generally demonstrated by a judgment, then the private cause of action (with its provision for double damages) is morphed into a super-judgment enforcement mechanism: when a primary plan is adjudged liable under the ERISA laws but obstinately refuses to pay the judgment, the plaintiff can file a new cause of action so that the primary plan is *really* forced to pay. But why would Congress think such an unusual mechanism to be necessary here? Why is the typical judicial process for executing judgments insufficient? No answer is given from *Glover*, Central States, or the Act's sparse legislative history. Second, why would Congress choose to limit so severely the Act's only private cause of action through a sentence buried multiple subparagraphs away, especially when that sentence is contained in a sub-subparagraph that is not directly referenced in the private cause of action's text? No answer. Third, how can the "demonstrated responsibility" provision limit the liability of a primary plan to a private party when the text of that provision only places a condition on when primary plans must pay *Medicare*, not private parties? No answer.

### 2.    Illumination from the History of the "Demonstrated Responsibility" Provision

If *Glover* leaves us in the dark, the history of the "demonstrated responsibility" provision is like turning on a light. Although the private cause of action has existed in the Act almost since the Act's inception,[11] the "demonstrated responsibility" provision is of more recent vintage. Congress added that provision in 2003 as part of an effort to address a specific situation: to enable Medicare to sue tortfeasors whose torts caused medical expenses borne by Medicare. *See generally* Rick Swedloff, *Can't Settle, Can't Sue: How Congress Stole Tort Remedies from Medicare Beneficiaries*, 41 Akron L. Rev. 557, 571-87 (2008) (providing an extensive history of the Act). In a series of cases in the early 2000s, Medicare asserted claims against the settlements that arose from

---

[11]The Act first became law in 1980, and Congress added the private right of action six years later. *See Manning v. Utils. Mut. Ins. Co.*, 254 F.3d 387, 396-97 (2d Cir. 2001) (citing Omnibus Budget Reconciliation Act of 1986, Pub. L. No. 99-509, § 9319, 100 Stat. 1874 (1986)).

individual- and mass-tort cases involving tobacco companies, drug manufacturers, and breast-implant manufacturers. *See Mason v. Am. Tobacco Co.*, 346 F.3d 36, 39 (2d Cir. 2003) (citing these cases). Essentially, Medicare had paid for some of the plaintiffs' medical expenses, so once the plaintiffs recovered their damages (which included medical expenses) from the tortfeasors, Medicare sought reimbursement.

Medicare brought these lawsuits under the Medicare Secondary Payer Act by relying on an ambiguity in the Act's definition of a "primary plan."[12] *See, e.g.*, *Thompson v. Goetzmann*, 337 F.3d 489, 493-95 (5th Cir. 2003). The Act defined a "primary plan" to include a "self-insured plan," but at the time the Act gave no guidance as to what constituted a self-insured plan. *See* 42 U.S.C. § 1395y(b)(2)(A) (2001), *amended by* Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, § 301, 117 Stat. 2066, 2221-22 (2003). Attempting to capitalize on this ambiguity, Medicare argued that the tortfeasors were "self-insured plans" because rather than purchasing liability coverage from a separate insurance carrier, the tortfeasors chose to carry their own risk of liability. *See Goetzmann*, 337 F.3d at 495. The federal courts, however, rejected this argument. *See, e.g.*, *Mason*, 346 F.3d at 42 ("[C]ourts have rejected all efforts to apply [the Act's] heavy remedy and double damages to the context of tort litigation."); *Goetzmann*, 337 F.3d at 496-501. Similarly, when inventive private plaintiffs filed a lawsuit against tobacco companies for their medical expenses on the same theory under the Act's private cause of action, the Second Circuit rejected it for the same reason: tortfeasors simply were not "self-insured plans." *See Mason*, 346 F.3d at 38-43. The Second Circuit concluded its opinion, in October 2003, with an unmistakable invitation to Congress: "Future amendments will be required for the statute to extend to the defendants in this action." *Id.* at 43.

Congress accepted the invitation only two months later. In December 2003, as part of the Medicare Modernization Act (which was best known for adding a prescription drug benefit for Medicare beneficiaries), Congress amended the Medicare Secondary

---

[12]It is worth noting that the Act contains a distinct cause of action by which Medicare can seek reimbursement, *see* 42 U.S.C. § 1395y(b)(2)(B)(iii), so the provision under which Medicare sued is different from the private cause of action that is the subject of this case.

Payer Act to accommodate Medicare's failed litigation position. For our purposes, Congress made two important changes. First, Congress expressly defined a "self-insured plan" as "[a]n entity that engages in a business, trade, or profession . . . if it carries its own risk (whether by a failure to obtain insurance, or otherwise) in whole or in part." Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, § 301(b)(1), 117 Stat. at 2221-22 (codified as amended at 42 U.S.C. § 1395y(b)(2)(A)). This amendment reflected Congress's clear intention to make tortfeasors liable under the Act. Although when stripped from its context, this new statutory definition seems an odd way to create tortfeasor liability, it makes perfect sense against the legislative backdrop: Medicare's insistence in court that tortfeasors were "self-insured plans." Indeed, the statutory definition of a "self-insured plan" mirrored the definition in a pre-existing federal regulation, to which the Fifth Circuit refused to give *Chevron* deference (despite Medicare's protestations) in *Goetzmann*, 337 F.3d at 498 & n.25, 501-02.[13] Moreover, the limited legislative history makes clear that Congress sought specifically to abrogate those cases, like *Goetzmann*, that narrowly defined "self-insured plan" and, thus, prevented tortfeasor liability under the Act; the legislative history even mentions *Goetzmann* by name. *See* H.R. Rep. No. 108-178, pt. 2 at 189-90 (2003) (stating that the amendment sought to address "[r]ecent court decisions such as *Thompson v. Goetzmann*" that allowed "firms that self-insure for product liability . . . to avoid paying Medicare for past medical payments related to the claim").

The second important amendment to the Act in 2003 was the "demonstrated responsibility" provision. *See* Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, § 301(b)(2)(A), 117 Stat. at 2222 (codified as amended at 42 U.S.C. § 1395y(b)(2)(B)(ii)). That provision states that a primary plan must reimburse Medicare only if its responsibility to pay has been

---

[13]That federal regulation, at the time, defined a "self-insured plan" as "a plan under which an individual, or a private or governmental entity, carries its own risk instead of taking out insurance with a carrier." 42 C.F.R. § 411.50(b). In *Goetzmann*, the Fifth Circuit emphasized that even under this definition, a tortfeasor would have to be a "plan," which stretched the Act too far. *See* 337 F.3d at 498-99. By replacing the term "plan" in the regulation's definition with the broader word "entity" in the new statutory definition, Congress plainly sought to abrogate that holding in *Goetzmann*.

demonstrated, which can occur through a judgment, settlement, or "other means." 42 U.S.C. § 1395y(b)(2)(B)(ii). Isolated from the context of its inclusion, the language of this provision is baffling and cryptic. But with the benefit of knowledge of its history and the legislative backdrop, we believe that we can answer two questions that are necessary to resolve this case and place the "demonstrated responsibility" provision in its proper place. First, does the "demonstrated responsibility" provision place a limiting condition on the liability of all primary plans, or does it limit the liability only of tortfeasors? Second, does the "demonstrated responsibility" provision apply only to lawsuits brought by Medicare for reimbursement, or does that provision also apply to lawsuits brought by private parties under the private cause of action? We answer these questions in the next two subsections.

### 3.     The "Demonstrated Responsibility" Provision Limits Only Tortfeasor Liability

We believe that Congress added the "demonstrated responsibility" provision as a limiting principle only for tortfeasor liability under the Act. Although the text of that provision is addressed to all "primary plans" — the Act's broadest category of private insurer, *see id.* § 1395y(b)(2)(A), which includes "self-insured plans," and therefore (after the 2003 amendments) tortfeasors — the context of its inclusion strongly suggests that Congress intended it only as a condition precedent to tortfeasor liability. As discussed above, Congress added the provision in the Medicare Modernization Act, in direct response to cases that prevented tortfeasor liability, as part of an effort to amend the Act to permit tortfeasor liability. The Medicare Modernization Act made no other major changes to the Medicare Secondary Payer Act,[14] so there is no reason to believe that Congress intended to affect the liability of primary plans other than tortfeasors — that is, traditional primary plans, like private insurers. Moreover, the concept of

---

[14] In addition to the two important changes mentioned above, the Medicare Modernization Act made only two other minor changes to the Medicare Secondary Payer Act. One of those changes was a self-described "technical amendment" that made express Medicare's previously implied authority to make conditional payments. Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, § 301(a), 117 Stat. at 2221 (codified as amended at 42 U.S.C. § 1395y(b)(2)(B)(i)). The other change broadened Medicare's ability to recover reimbursement: it permitted Medicare to recover from the proceeds of a primary plan's payment to any entity. *Id.* § 301(b)(3), 117 Stat. at 2222 (codified as amended at 42 U.S.C. § 1395y(b)(2)(B)(iii)); *see generally* Swedloff, *Can't Settle, Can't Sue*, 41 Akron L. Rev. at 583-84.

demonstrated responsibility makes sense only in the context of tort (where no evidence of responsibility exists until it is adjudicated ex post), rather than in the context of an insurance contract (where insurers assume the responsibility of paying for enumerated contingencies ex ante). *See Mason*, 346 F.3d at 42 (discussing, in one of the very cases that precipitated Congress' amendments to the Act, this problem with tortfeasor liability under the Act: "alleged tortfeasors . . . have yet to assume the medical costs of any identifiable group of individuals"). Accordingly, we hold that the "demonstrated responsibility" provision limits only lawsuits against tortfeasors, not lawsuits against private insurers.

This interpretation is now fully supported by a federal regulation adopted in February 2006. The "demonstrated responsibility" statutory provision states that responsibility can be demonstrated by judgment, settlement, or "other means." 42 U.S.C. § 1395y(b)(2)(B)(ii). Recognizing that Congress intended to limit the impact of this provision to tortfeasors, the Centers for Medicare and Medicaid Services (which administers Medicare) promulgated a regulation that expressly defines "other means" to include a "contractual obligation." 42 C.F.R. § 411.22(b)(3). In other words, the federal agency recognized that an insurance contract automatically demonstrates a traditional private insurer's responsibility to pay, thereby rendering the "demonstrated responsibility" provision superfluous in such cases. This regulation interprets the ambiguous statutory phrase "other means" and is reasonable because it implicitly acknowledges that while a tortfeasor's responsibility must be determined ex post, the nature of insurance is the assumption of responsibility ex ante. *Cf. Chevron U.S.A. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-844 (1984).

The meaning of our holding and the regulation for the instant case is that the "demonstrated responsibility" provision does not bar Bio-Medical's lawsuit against Central States. Central States is a traditional insurer, not a tortfeasor. And the "demonstrated responsibility" provision places a condition precedent only on lawsuits against tortfeasors. Thus, that provision does bar Bio-Medical's claim in this case. A healthcare provider like Bio-Medical need not first demonstrate the responsibility of a

private insurer like Central States before bringing a lawsuit for double damages under the Act's private cause of action. It need not first sue and win, in order to sue again.

Thus far, although we have provided a more complete analysis on this issue than the *Glover* opinion, we do not yet part company with it, because *Glover* applied the "demonstrated responsibility" provision in a lawsuit where the defendant was a tortfeasor. The language in *Glover* sweeps broadly, however, and there is widespread confusion in the district courts about the proper scope of the "demonstrated responsibility" provision. For these reasons, we believe it is best to address another question: whether the "demonstrated responsibility" provision applies only to lawsuits brought by Medicare for reimbursement, or if that provision also applies to lawsuits brought by private parties under the private cause of action.

### 4. The "Demonstrated Responsibility" Provision Limits Only Lawsuits Brought by Medicare

The "demonstrated responsibility" provision applies only to lawsuits brought by Medicare, not lawsuits brought by private parties under the Act's private cause of action. No fewer than five reasons militate in favor of this conclusion. First, and most importantly, the provision's text places a condition only on when primary plans must reimburse Medicare; it does not mention when plans must pay private parties. *See* 42 U.S.C. § 1395y(b)(2)(B)(ii). Second, the structure of the Act suggests that the provision is limited to the reimbursement of Medicare. Congress placed the provision within subparagraph (2)(B), which governs the relationship between Medicare and primary plans. *See id.* § 1395y(b)(2)(B). Nowhere does subparagraph (2)(B) mention private parties, which are considered elsewhere, in paragraph (3), *see id.* § 1395y(b)(3)(A). Third, the legislative history suggests the same. In the public law that added the "demonstrated responsibility" provision, the provision appeared under a heading entitled "clarifying amendments to conditional payment provisions." Medicare Prescription Drug, Improvement, and Modernization Act of 2003, Pub. L. No. 108-173, § 301(b), 117 Stat. at 2221-22. Only Medicare can make conditional payments. And both of the other two amendments added under this heading (including the one that permitted tortfeasor liability) governed Medicare's ability to seek reimbursement. *See*

*id.* § 301(b)(1), (3), 117 Stat. at 2221-22 (codified as amended at 42 U.S.C. § 1395y(b)(2)(A), (B)(iii)).  Fourth, as discussed above, the predominant legislative backdrop was *Medicare's* (not private parties') failed attempts to bring lawsuits against tortfeasors.  Fifth, attempting to apply the "demonstrated responsibility" provision to lawsuits brought by private parties essentially relegates the private cause of action to a super-judgment enforcement mechanism, and no plausible explanation exists for why Congress would have sought to limit it in that way.

We believe it is important to note that under our theory of the Medicare Secondary Payer Act, the ultimate result reached in the *Glover* case — dismissing a lawsuit brought by private parties against tortfeasors under the Act's private cause of action, 459 F.3d at 1308-10 — was correct, although not for so broad a reason as the language in *Glover* states.  Motivating the decision in *Glover* were concerns that a contrary holding (1) would "drastically expand federal court jurisdiction by creating a federal forum to litigate any state tort claim in which a business entity allegedly injured a Medicare beneficiary" and, similarly, (2) would undermine class action requirements. *Id.* at 1309.  Our approach avoids those potential pitfalls.  We believe that when Congress amended the Act in 2003 to permit lawsuits against tortfeasors and to add the "demonstrated responsibility" provision, Congress intended to permit lawsuits against tortfeasors only by *Medicare*, and not lawsuits against tortfeasors by *private parties*.  Thus, the plaintiffs' case in *Glover* should have failed not because the defendant's responsibility to pay had not been previously demonstrated, but rather because the Act does not permit a private cause of action (as opposed to one brought by Medicare) in tort.

Due to widespread confusion about the "demonstrated responsibility" provision in the federal courts, we believe it is worth mentioning the several district court cases that erroneously applied the provision in reliance on *Glover* (some of which were from within our circuit).  In some of the district court cases, the plaintiffs — arguing that the Act was a *qui tam* statute — were uninjured individuals who attempted to sue tobacco companies or health systems on behalf of the United States, and the courts of appeals

held dismissal appropriate, but on another ground:  those plaintiffs lacked Article III standing.  *See, e.g.*, *Nat'l Comm. to Preserve Soc. Sec. & Medicare v. Phillip Morris USA Inc.*, 601 F. Supp. 2d 505, 509 (E.D.N.Y. 2009), *vacated and remanded*, 395 F. App'x 772 (2d Cir. 2010); *Stalley v. Erlanger Health Sys.*, Nos. 1:06-CV-194, 2:06-CV-216, 2:06-CV-217, 2:06-CV-265, 3:06-CV-359, 2007 WL 672301, at *5-6 (E.D. Tenn. Feb. 28, 2007), *aff'd on other grounds*, *Stalley v. Methodist Healthcare*, 517 F.3d 911 (6th Cir. 2008).  In other district court cases, the district courts extended the *Glover* language even further — by applying the "demonstrated responsibility" provision to the traditional insurance context, rather than merely to lawsuits against alleged tortfeasors, to prevent lawsuits by healthcare providers against private insurers.  *See Nat'l Renal Alliance, LLC v. Blue Cross & Blue Shield of Ga., Inc.*, 598 F. Supp. 2d 1344, 1354 n.5 (N.D. Ga. 2009); *Fresenius Med. Care Holdings, Inc. v. Brooks Food Grp., Inc.*, Civil Action No. 3:07CV14-H, 2007 WL 2480251, at *7-8 (W.D.N.C. Aug. 28, 2007).  All of these cases applied the "demonstrated responsibility" provision beyond its proper scope.

This holding provides an independent reason for why the "demonstrated responsibility" provision does not preclude this lawsuit by Bio-Medical against Central States.  Bio-Medical sued Central States under the Act's private cause of action.  And the "demonstrated responsibility" provision places a condition that must be fulfilled only before primary plans (specifically, tortfeasors) must reimburse Medicare, not before they must pay private parties.  Accordingly, that provision does not apply in this case, and Bio-Medical's lawsuit under the private cause of action can proceed.  The district court erred in holding otherwise.

### 5. Disposing of Central States' Remaining Arguments Regarding the Provision

Central States makes three other arguments for its interpretation of the "demonstrated responsibility" provision, but none are persuasive.  First, Central States argues that if we do not apply the provision in this case, we would render the provision surplusage.  But that is plainly false:  the "demonstrated responsibility" provision still applies in all instances where Medicare sues alleged tortfeasors for the reimbursement

of medical expenses caused by the tortfeasors. Medicare cannot bring such a lawsuit until the alleged tortfeasor's responsibility to pay has been demonstrated.

Second, Central States points to the word "fails" in the private cause of action, which provides for liability when a primary plan "fails to [pay] in accordance with paragraphs (1) and (2)(A)." *See* 42 U.S.C § 1395y(b)(3)(A). One cannot "fail" to pay, Central States argues, unless one has been told to do so and refused — in other words, unless one's responsibility to pay already has been demonstrated. *Cf. Glover*, 459 F.3d at 1309 (reasoning that "it cannot be said that Defendants have 'failed' to provide appropriate reimbursement" until their responsibility has been demonstrated). But this argument stretches the word "fails" far beyond both its legal and common meanings. The most relevant definition in Ninth Edition of Black's Law Dictionary defines the verb "to fail" as "to be deficient or unsuccessful; to fall short." Nowhere does this definition indicate that "failing" requires obstinacy, as Central States suggests. And in common usage, a student can fail an exam on his first attempt, just as a debtor can fail to make the first of many monthly payments.

Third, Central States argues that the purpose of the "demonstrated responsibility" provision is to permit private insurers to contest their liability without the threat of double damages, which automatically apply under the private cause of action. In other words, Central States argues, the provision prevents the "windfall recoveries" that would accrue to private plaintiffs whenever a private insurer unsuccessfully contests its liability. But Central States provides no reason why Congress would seek to protect in this manner private insurers who violate the Act by shifting costs to Medicare. *See Mason v. Am. Tobacco Co.*, 346 F.3d 36, 43 (2d Cir. 2003) ("[I]t is harsh to impose [Medicare Secondary Payer Act] liability against alleged tortfeasors, but it is not harsh to impose such liability against entities who renege upon a pre-existing contractual arrangement to provide healthcare coverage. That is, it is not harsh to use the statute to serve the purpose for which it was enacted."). Moreover, the double damages required by the Act's private cause of action are not a windfall to the private plaintiff; rather, as

discussed below, the Act contemplates that Medicare will seek reimbursement out of that recovery, so the plaintiff most likely will keep only its half.

### 6. Summary of Holdings and Implications for This Case

We pause briefly to review our holdings. The "demonstrated responsibility" provision in the Medicare Secondary Payer Act, 42 U.S.C. § 1395y(b)(2)(B)(ii), does not apply to lawsuits brought by private parties under the Act's private cause of action, *id.* § 1395y(b)(3)(A), because the Act does not purport to create an action by healthcare providers against tortfeasors. Rather, that provision applies only to lawsuits brought by Medicare for reimbursement. Nor does that provision limit lawsuits against traditional insurers; it limits only lawsuits against tortfeasors. The proper scope of the "demonstrated responsibility" provision, therefore, is to limit the class of alleged tortfeasors whom Medicare can sue for reimbursement: those who have already been adjudged liable (or have entered into a settlement, etc.) for causing harm that led to Medicare expenses.

Applying these holdings to our case, it is clear that Bio-Medical must prevail under the Act's private cause of action. The private cause of action entitles the plaintiff to double damages when the defendant failed to pay "in accordance with paragraphs (1) and (2)(A)." *Id.* Bio-Medical sued Central States under the private cause of action, and as discussed in Part III(A) above, Bio-Medical has proven that Central States failed to pay in accordance with paragraphs (1) and (2)(A). Accordingly, Central States is liable under the private cause of action. All that remains is to answer one more lingering puzzle: What is the proper amount of double damages?

### C. The Reference Point for Double Damages under the Private Cause of Action

Having concluded that Central States is liable to Bio-Medical under the Medicare Secondary Payer Act's private cause of action, we must next determine the precise amount of damages under that provision. In keeping with the rest of the Act, however, this is no easy task. The private cause of action cryptically states that damages "shall be in an amount double the amount otherwise provided." *Id.* No part of the Act "otherwise

provides" more specifically for these damages, so the private cause of action raises the question: What is the reference point for these double damages? There are two obvious possibilities. Either the private cause of action provides for double the amount of damages incurred by the healthcare provider (i.e., twice the value of the outstanding bills to the delinquent private insurer), or it provides for double the damages incurred by Medicare (i.e., twice the value of the conditional payments made by Medicare to cover the private insurer's failure to pay). Because Medicare usually pays healthcare providers at lower rates than do private insurers, *e.g.*, *Palmyra Park Hosp. Inc. v. Phoebe Putney Mem'l Hosp.*, 604 F.3d 1291, 1295 n.3 (11th Cir. 2010), twice the provider's damages typically will exceed twice Medicare's damages.

Determining the proper amount of double damages requires us to consider the final piece in the jigsaw puzzle of the statutory system: Why does the Medicare Secondary Payer Act's private cause of action provide for double damages? One theory is that the Act seeks to punish private insurers that violate its prohibition of shifting costs to Medicare, and thereby to deter such future cost shifting by private insurers, as well. By punishing and deterring illegal action to combat a social ill, the Act would function much like the antitrust laws. *Cf. Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 639 (1981) ("The very idea of treble damages [in the antitrust laws] reveals an intent to punish past, and to deter future, unlawful conduct . . . ."). This theory is probably at least part of the reason why Congress provided for double damages. But antitrust violations differ from the harm caused by violations of the Act in an important way: violations of the Act are perpetrated not against the marketplace generally, but rather against the government (specifically, against Medicare). Indeed, it is axiomatic that the Act's purpose was to protect Medicare's fiscal integrity. *See, e.g., Fanning v. United States*, 346 F.3d 386, 388 (3d Cir. 2003). Although Medicare's fiscal integrity may be protected by deterring future cost shifting, it will be protected more directly by reimbursing Medicare for the payments it was forced to make due to private insurers' illegal conduct.

This fact points to another theory for why Congress created a private right of action for double damages against private insurers: double damages provide a needed incentive for private plaintiffs to bring claims against private insurers that have shifted costs to Medicare, so that Medicare is alerted and can seek reimbursement. Healthcare providers, not the Medicare bureaucracy, are presumably in the best position to observe when private insurers have refused to pay for an insured patient's treatment due to the patient's eligibility for Medicare.[15] And providers usually suffer their own injury when private insurers refuse to pay, because providers generally are paid less by Medicare than they would be paid by private insurers. The Act turns this natural information asymmetry to Medicare's advantage. It empowers healthcare providers to sue private insurers who violate the Act. It then enables Medicare to pursue its reimbursement out of the proceeds recovered by the victorious healthcare providers. *See* 42 U.S.C. § 1395y(b)(2)(B)(iii).

Because healthcare providers anticipate that Medicare will seek its reimbursement from the proceeds, however, they must receive a premium over the reimbursement amount to be motivated to bring these lawsuits against private insurers. After all, litigation is not free, nor is it free from risk. For a healthcare provider to bring such a lawsuit, the provider must believe that the expected value of the litigation — which equals the amount of damages the provider would win if it prevailed, discounted by the probability that it might lose, minus all legal fees and expenses — will exceed the amount that Medicare likely will take as its share. And if the damages that the provider wins if it prevails were merely equal to Medicare's share, providers would never bring

---

[15]This relative inability of the Center for Medicare and Medicaid Services to determine when private insurers have shifted costs to Medicare in violation of the Act was likely the reason why Congress recently added strict reporting requirements to the Act. *See* Medicare, Medicaid, and SCHIP Extension Act of 2007, Pub. L. No. 110-173, 121 Stat. 2492 (codified as amended in scattered sections of 42 U.S.C.). Section 111 outlines mandatory reporting requirements — making group health plans, liability insurers (including self-insurers), no-fault insurers, and workers' compensation insurers responsible for alerting Medicare of its "secondary payer status" in certain claims. *Id.* § 111, 121 Stat. at 2497-99 (codified as amended at 42 U.S.C. § 1395y(b)(7)-(8)); *see generally* Brent M. Timberlake & Monica A. Stahly, *Fool Me Once, Shame on Me; Fool Me Again and You're Gonna Pay for It: An Analysis of Medicare's New Reporting Requirements for Primary Payers and the Stiff Penalties Associated with Noncompliance*, 45 U. Rich. L. Rev. 119 (2010). These new reporting requirements should work in concert with the incentives created by the private cause of action for double damages.

these claims.[16] Accordingly, Congress enabled healthcare providers to recover double damages to motivate them to bring lawsuits that, in the end, vindicate Medicare's interests. *See Manning v. Utils. Mut. Ins. Co., Inc.*, 254 F.3d 387, 394 (2d Cir. 2001) (reasoning that the Act "allow[s] for a multiplier of damages to enable the government to recover its funds while also providing a financial incentive for private citizens to bring such suits").[17]

Double damages must be at least enough such that the expected value of the litigation, after subtracting Medicare's anticipated recovery, will be greater than zero. If this were the only consideration, we would hold that the reference point for double damages is the amount the private insurer would have paid, rather than the amount paid by Medicare, because the former usually exceeds the latter. But there is another important consideration: this Court has held that "[w]hen Medicare is not involved in an insurance coverage dispute . . . that program's fiscal integrity is not threatened, and the [Medicare Secondary Payer Act] does not apply." *Perry v. United Food & Commercial Workers Dist. Unions 405 & 442*, 64 F.3d 238, 243 (6th Cir. 1995).

---

[16]A numerical example may help illustrate. Suppose that General Hospital provides medical treatment to Patient and bills Private Insurer in the amount of $200,000. Private Insurer refuses to pay because Patient is eligible for Medicare. General Hospital then bills Medicare, which pays General Hospital $150,000. General Hospital considers suing Private Insurer under the Act's private cause of action. Assuming that the Act's double damages are double the amount Medicare would have paid, General Hospital would win $300,000 if victorious. Assume, as well, that General Hospital estimates its chances of winning the case to be 80 percent and its total legal expenses to be $50,000. Accordingly, the expected value of the lawsuit for General Hospital is $190,000. After Medicare recovers its conditional payment of $150,000 from General Hospital, General Hospital will be left with $40,000. Thus, the likelihood is that the litigation will be profitable, so General Hospital will pursue it. Without double damages, however, the litigation cannot be profitable for General Hospital (unless we assume a high likelihood that Medicare will not seek reimbursement), so General Hospital will not sue, and Medicare's interests will not be vindicated. In addition to illustrating the importance of double damages to the statutory scheme, this example should highlight the importance of the values of each of these variables — most of which we cannot ascertain from the record — in determining the proper reference point for double damages.

[17]In this sense, even though numerous courts (including the Sixth Circuit) have correctly observed that the Act's private cause of action is not a *qui tam* provision (that is, a provision that conveys the government's Article III standing to an otherwise-uninjured plaintiff to bring a claim on behalf of the government), *see, e.g.*, *Woods v. Empire Health Choice, Inc.*, 574 F.3d 92, 100 (2d Cir. 2009) (collecting cases), lawsuits under the private cause of action *resemble qui tam* actions because the Act incentivizes aware private parties to sue to vindicate harm to the government, *see Manning v. Utils. Mut. Ins. Co., Inc.*, 254 F.3d 387, 394-95 (2d Cir. 2001) ("The [False Claims Act, the most notable *qui tam* statute,] is similar to the [Medicare Secondary Payer Act] in that both statutes allow individual citizens, as well as the government, to sue in order to right an economic wrong done to the government."). The Act differs from a *qui tam* statute, however, because private plaintiffs must suffer their own harm. *See Woods*, 574 F.3d at 97-101. By allegedly being paid less by Medicare than it would have been paid by Central States, Bio-Medical suffered its own harm here.

Although *Perry* involved a dispute between two private insurers (who were both primary payers over Medicare), *id.* at 240-41, its reasoning could be extended to an argument that the Act permits damages only to the extent that Medicare faces injury, and that Medicare's injury is limited to the amounts it pays to the provider. Under this line of reasoning, the amount "otherwise provided" for double damages would be the amount that Medicare stands to lose due to the primary plan's failure to pay.

Due to a paucity of briefing on the law and material facts, we stop short of a holding on the proper reference point for double damages under the Act's private cause of action. Bio-Medical's appellate brief provides no argument on this issue. Moreover, although Bio-Medical indicates that it received "a portion" of payment from Medicare in an amount less than the approximately $210,000 it billed Central States (*see* Compl. ¶¶ 21, 30), Bio-Medical does not state the amount of that payment. Nor does either party provide estimates of other helpful figures, including, for example, the likelihood that Medicare will seek reimbursement out of the proceeds of this lawsuit. For its part, Central States argues conclusorily that double damages must be limited to double the amount that Medicare pays, but it provides little authority or reasoned support. Accordingly, we remand to the district court for a determination on this issue.

## IV. Conclusion

For the foregoing reasons, we **AFFIRM** the district court's grant of summary judgment to Bio-Medical on its ERISA claim and the dismissal of Central States' counterclaim, we **REVERSE** the district court's dismissal for failure to state a claim of Bio-Medical's claim under the private cause of action of the Medicare Secondary Payer Act, and we **REMAND** for further proceedings consistent with this opinion.

_____

**CONCURRENCE**

_____

HELENE N. WHITE, Circuit Judge (concurring).  I join in Judge Merritt's thoughtful and cogent discussion of the Act, except as set forth herein.  I write separately to clarify some of my own reasoning in deciphering this difficult statute, and to explain why I would not decide two issues not necessary to a decision in this case.

I.      **Observations Regarding the History of the Private Cause of Action.**

When first enacted, the private-cause-of-action provision read:

> There is hereby created a private cause of action for damages (which shall be in an amount double the amount otherwise provided) in the case of a workmen's compensation law or plan, automobile or liability insurance policy or plan or no fault insurance plan, group health plan, or large group health plan which is made a primary payer under paragraph (1), (2), (3) or (4), respectively, and which fails to provide for primary payment (or appropriate reimbursement) in accordance with such respective paragraphs.

Omnibus Budget Reconciliation Act of 1986, Pub. L. No. 99-509, § 9319(b), 100 Stat. 1874.  At that time, paragraphs (1) - (4) set forth the circumstances in which Medicare was only secondarily responsible and was permitted to make conditional payments subject to reimbursement.  *See* 42 U.S.C. § 1395y(a)(1)-(4).  These circumstances have been steadily expanded over the history of the Act.  At first only workers' compensation and other government benefits were primary to Medicare, *see* Social Security Amendments of 1965, Pub. L. No. 89-97, § 1862(a), 79 Stat. 286; then automobile and liability insurance policies and plans, including no-fault auto insurance, were made primary, *see* Omnibus Reconciliation Act of 1980, Pub. L. No. 96-499, § 953, 94 Stat. 2599; then plans covering end-stage renal decease were made primary, *see* Omnibus Budget Reconciliation Act of 1981, Pub. L. No. 97-35, § 2146(a), 95 Stat. 357; then active employees covered by group health plans were excluded from primary Medicare coverage, *see* Tax Equity and Fiscal Responsibility Act of 1982, Pub. L. No. 97-248,

§ 116(b), 96 Stat. 324; then large group health plans were made primary, *see* Omnibus Budget Reconciliation Act of 1986, *supra*, § 9319(a).

Paragraphs (1) - (4), referred to in the original private-cause-of-action provision, Pub. L. No. 99-509, § 9319(b), each included language very similar to the language now found in 42 U.S.C. § 1395y(b)(2)(A), regarding when conditional payment may be made by Medicare and the obligation to reimburse the appropriate Trust Fund for such payments.[1]  Thus, the private cause of action has always been based on a primary plan's failure to make payments as required by the provisions that make the plan primary and permit Medicare to make conditional payments.  For this reason, I conclude that the private-cause-of-action provision's reference to a "fail[ure] to provide for primary payment (or appropriate reimbursement) in accordance with paragraphs (1) and (2)(A)" is simply the current, short-handed iteration of the original provision.

The structure of the provision bears this out.  The current version, § 1395y(b)(3)(A), provides:

> There is established a private cause of action for damages (which shall be in an amount double the amount otherwise provided) in the case of a primary plan which fails to provide for primary payment (or appropriate reimbursement) in accordance with paragraphs (1) and (2)(A).

Viewing the original and current private-cause-of-action provisions together, it is apparent that the current provision follows the same structure as the original, but omits

---

[1]For example, paragraph (b)(1) provided:

> Payment under this subchapter may not be made with respect to any item or sevice to the extent that payment has been made, or can reasonably be expected to be made promptly . . . under a workmen's compensation law or plan of the United States or a State or under an automobile or liability insurance policy or plan (including a selfinsured plan) or under no fault insurance.  Any payment under this subchapter with respect to any item or service shall be conditioned on reimbursement to the appropriate Trust Fund. . . when notice or other information is received that payment for such item or service has been or could be made under such a law, policy, plan or insurance.  In order to recover payment made under this subchapter for an item or service, the United States may bring an action against any entity which would be responsible for payment with respect to such item or service . . . .

42 U.S.C. § 1395y(b)(1) (1982 & Supp. 3 Vol. 3 (1983-1986)).  Similar language was found in paragraphs (2), (3) and (4).  *See id.*

the listing of the primary payers, referring to them only as primary plans, and then refers to paragraphs (1) and (2)(A) rather than paragraphs (1) - (4).

Paragraphs (1) - (4), referred to in the original private-cause-of action provision, contained the same conditional payment and reimbursement provisions now found in paragraph (2)(A) of the current Act, referred to in the current private-cause-of-action provision. Thus, I find no special significance in the use of the conjunctive in §1395y(b)(3)(A)(referring to a failure to pay or reimburse in compliance with paragraphs (1) *and* (2)(A)) and agree that § 1395y(b)(3)(A) simply provides for a private cause of action when a primary plan fails to provide payment due under paragraph (1), leaving Medicare next in line to pay.

II.     **Clarification that the Demonstrated Responsibility Provision Applies to Claims Based on Policies and Plans But Does Not Operate to Limit Such Claims Because the Contract Underlying Such Claims Demonstrates Responsibility "by Other Means."**

The demonstrated-responsibility provision by its very terms permits a primary plan's responsibility to be demonstrated by "a judgment, a payment conditioned upon the recipient's compromise, waiver, or release . . . , *or by other means*." 42 U.S.C. § 1395y(b)(2)(B)(ii) (emphasis added). As noted by the majority, the applicable regulations define "other means" to include proof of a contractual obligation. Thus, when the demonstrated-responsibility provision is applicable, it applies to claims against traditional primary plans, but it does not require a prior judgment because the contract, policy or plan is sufficient.

III.     **It is Not Necessary to Decide Whether the Act Recognizes a Private Cause of Action Against Tortfeasors and, If So, Whether the Demonstrated Responsibility Provision Would Apply.**

The majority holds that the demonstrated-responsibility provision only applies to suits by Medicare and that only Medicare can sue a primary plan in tort under the Act. Although this is a sensible reading of the Act, it is not the only reasonable interpretation, and therefore I would leave the resolution of these questions to a case that presents them directly.

The demonstrated-responsibility provision is found in § 1395y(b)(2)(B)(ii), entitled "Primary plans," which sets forth the general obligation to reimburse Medicare for payments made by Medicare when a primary plan has primary responsibility. It is not found in subsection (2)(B)(iii), entitled "Action by United States." The private-cause-of-action provision permits an action when a primary plan fails to provide for primary payment or appropriate reimbursement. The reimbursement obligation is set forth in (2)(B)(ii), which contains the demonstrated-responsibility provision. Further, the provision permitting a private action when a primary plan fails to provide primary payment or reimbursement does not exclude tortfeasors from the definition of primary plan or except primary plans whose liability is based in tort.

Thus, it is not clear, at least to me, from the language or structure of the Act that only Medicare (to the exclusion of healthcare providers) can sue primary plans whose liability is founded in tort. Because the question was not briefed, its resolution is not necessary to resolve this case, and statements addressing the question may be read as more than *dicta*, I would not decide the issue.

Related to the question who can sue a tortfeasor is whether the demonstrated-responsibility provision applies only to Medicare. If a private party can sue a primary plan whose liability is founded in tort, it would follow that the demonstrated-responsibility provision would apply. This is a reasonable, albeit not the only reasonable, construction of the Act because the demonstrated-responsibility provision is found in the primary-plan-reimbursement subsection, not the action-by United States subsection. Thus, I would leave this question to another day as well.