NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0186n.06

No. 19-1796

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| LYNETTE DUNCAN, as Personal Representative of the Estate of David Duncan, Deceased, | ) ) ) | **FILED**<br>Apr 13, 2021<br>DEBORAH S. HUNT, Clerk |
| Plaintiff-Appellant, | ) ) | |
| MICHIGAN DEPARTMENT OF HEALTH AND HUMAN SERVICES, | ) ) ) | |
| Intervenor, | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| v. | ) ) | |
| LIBERTY MUTUAL INSURANCE COMPANY, | ) ) | |
| Defendant-Appellee. | ) ) | |

**BEFORE:** **BOGGS, SUTTON, and WHITE, Circuit Judges.**

**BOGGS, Circuit Judge.** This appeal arises out of a lengthy dispute between David Duncan and Liberty Mutual Insurance Company ("Liberty Mutual") over the payment of David Duncan's medical expenses under his no-fault car-insurance policy with Liberty Mutual. Lynette Duncan, representing David Duncan's estate, appeals the district court's judgment on remand dismissing her claim against Liberty Mutual for double damages under the Medicare Secondary Payer Act ("MSPA"), 42 U.S.C. § 1395y(b)(3)(A). The district court held that Lynette Duncan does not have standing to bring that claim and, alternatively, granted partial summary judgment to Liberty Mutual, holding that the conduct of Liberty Mutual did not violate the MSPA, as would be required to trigger the double-damages provision of the statute. We affirm the district court's dismissal.

## I.  BACKGROUND

### A.  Factual Background

On January 11, 2013, David Duncan was involved in a single-car accident, in which he suffered severe brain injury.  Duncan never regained consciousness and, after spending almost two years in hospitals and long-term-care facilities, died on December 4, 2014 as a result of the injuries he had suffered in the car accident.

Liberty Mutual alleges that, four days after the accident, it had complied with statutory Medicare reporting requirements as a no-fault insurer by notifying the Centers for Medicare and Medicaid Services ("CMS") that David Duncan had Medicare coverage.  But on June 4, 2013, Liberty Mutual informed David Duncan that it was denying no-fault insurance coverage for his injuries.  Around the same time, Liberty Mutual informed McLaren Oakland, a hospital that had treated David Duncan, that it was suspending payment of no-fault insurance benefits, based on Liberty Mutual's review of the claim.

On July 2, 2013, McLaren Oakland filed suit in Wayne County Circuit Court against Liberty Mutual, seeking reimbursement of the cost of Duncan's medical treatment in the amount of $153,022 plus interest and fees.  McLaren Oakland alleged that Liberty Mutual paid some, but not all, medical bills related to Duncan's January 11, 2013 accident, and sought reimbursement of the balance of $153,022.  McLaren Oakland's case against Liberty Mutual was litigated up until May 28, 2015, after the state court denied Liberty Mutual's motion for summary disposition.

In the meantime, David Duncan's medical expenses were paid by Medicare conditionally, to be reimbursed by Liberty Mutual as the primary insurer under David Duncan's no-fault car insurance policy in case his expenses were covered under the policy.  While the case of McLaren Oakland against Liberty Mutual was pending, David Duncan filed a complaint against Liberty

2

Mutual in Oakland County Circuit Court on August 1, 2013, seeking payment of personal-injury-protection ("PIP") insurance benefits under Michigan's no-fault act, Mich. Comp. Laws §§ 500.3101 *et seq.* The complaint alleged Count I, breach of contract, and Count II, declaratory relief, asking the court to determine the applicability of Michigan's no-fault act to Duncan's claims and the amount of damages, including wage loss, medical expenses, interest, and attorney's fees. After David Duncan's death on December 4, 2014, the action was continued by his wife, Lynette Duncan, as personal representative of his estate.

With the two parallel cases against Liberty Mutual approaching separate trial dates, McLaren Oakland and Liberty Mutual filed on May 28, 2015 a stipulated order for dismissal without prejudice, pending the outcome of the Duncan suit against Liberty Mutual.

On January 16, 2015, CMS sent Liberty Mutual a letter identifying $225,668.29 in conditional payments for David Duncan's medical expenses that CMS believed were covered under his no-fault insurance policy with Liberty Mutual. On February 9, 2015, Liberty Mutual denied no-fault insurance coverage after Duncan's death in a letter to CMS, because it concluded that David Duncan had suffered a cardiac arrest prior to the car accident, and that this cardiac arrest had been the cause of both the accident and his brain injury. After negotiations between Liberty Mutual and CMS regarding reimbursement of David Duncan's medical expenses, CMS sent a letter to Liberty Mutual on June 19, 2015 with a determination that the medical expenses of David Duncan that had been conditionally paid by Medicare were unrelated to his no-fault insurance, and that Medicare had no interest in recovery from Liberty Mutual. The CMS letter also advised Liberty Mutual and the estate of David Duncan of a deadline of October 22, 2015 to appeal this ruling.

The estate of David Duncan did not request reconsideration of CMS's determination until October 26, 2015, which was four days past the notified deadline for appeals, and hence the agency's determination had become final. The estate's untimely request for reconsideration noted an ongoing lawsuit against Liberty Mutual in this matter with a trial date set for December 10, 2015.

However, in the meantime, on October 23, 2015, one day after the deadline for requesting reconsideration had expired, Liberty Mutual filed with the state court in Duncan's suit a motion for partial summary judgment, submitting the determination letter from Medicare, which stated that Medicare had made *conditional* payments in the amount of $0.00, and arguing that David Duncan's medical expenses in the amount of $671,159.22 were therefore unrelated to his no-fault insurance and that, consequently, Medicare had no right to recover from Liberty Mutual as it was not a secondary payer for purposes of the MSPA.

Liberty Mutual and the estate of David Duncan proceeded to trial in March 2016 on the limited issue of Liberty Mutual's liability for no-fault benefits. The estate obtained a unanimous jury verdict against Liberty Mutual that resulted in an April 18, 2016 judgment:

> IT IS HEREBY ORDERED AND ADJUDGED that Plaintiff's Decedent, David Duncan, deceased, suffered an accidental bodily injury that arose out of the use or operation of a motor vehicle as a motor vehicle that caused or contributed to his anoxic brain injury on January 11, 2013.

After receiving the jury verdict, but prior to entry of judgment, Liberty Mutual sent a letter on April 1, 2016 advising Medicare of Liberty Mutual's responsibility as a primary insurer in relation to David Duncan's medical expenses resulting from his car accident and requesting a letter specifying the amount for which Medicare would seek reimbursement. CMS then submitted to Liberty Mutual on October 26, 2016 a non-final request for reimbursement of $174,815.20 and on February 20, 2018 a payment-demand letter for the same amount, which Liberty Mutual paid on

March 6, 2018 by a check hand-delivered to Duncan's counsel. Duncan's counsel forwarded Liberty Mutual's check to CMS along with a transmittal letter claiming that the case was not closed, because an earlier conditional-payment letter dated January 16, 2015 indicated that there were still outstanding Medicare conditional payments totaling at least $51,255.06.

Also after the jury verdict, on March 30, 2016, the estate of David Duncan, represented by Lynette Duncan, moved for leave to file an amended complaint adding a claim for double damages under the Medicare Secondary Payer Act, 42 U.S.C. § 1395y(b)(3)(A).

On May 11, 2016, McLaren Oakland, a hospital that had treated David Duncan and that previously stipulated to dismiss without prejudice its parallel suit against Liberty Mutual, filed a motion to intervene in the Duncan suit. McLaren Oakland sought recovery of its charges for Duncan's medical treatment, which were previously paid only partly by Liberty Mutual, and then paid by Medicare at a rate significantly lower than a no-fault insurer would pay. Liberty Mutual had paid on June 4, 2013 only $20,181 of the $173,223.10 billed by McLaren Oakland to Liberty Mutual as primary insurer for the hospitalization of David Duncan. After Liberty Mutual refused to pay the balance, McLaren Oakland sought payment from Medicare and was conditionally paid $58,229.22. The hospital intervened to seek recovery of the outstanding portion of its $173,461.10 in medical services, i.e., $95,050.88, plus no-fault statutory interest and attorney's fees.

On June 10, 2016, Liberty Mutual opposed Lynette Duncan's motion to amend the complaint. The trial court granted the motion on July 7, 2016, and Lynette Duncan filed a first amended complaint on July 8, 2016, adding a claim for double damages under the MSPA, 42 U.S.C. § 1395y(b)(3)(A), as Count III.

Liberty Mutual then removed the case to the United States District Court for the Eastern District of Michigan on July 8, 2016 on the basis of federal-question jurisdiction.

In her action in state court, Lynette Duncan claimed to represent the interests of Medicaid, while the Michigan Department of Health and Human Services was represented in the same state-court proceedings by an assistant attorney general with respect to subrogation against Liberty Mutual for Medicaid expenditures. Michigan Department of Community Health also filed on May 13, 2015 a proof of claim against the estate of David Duncan for Medicaid payments in the amount of $110,174.44. Lynette Duncan further asserted in state court the right to recover on behalf of Medicare the amounts allegedly covered by Liberty Mutual's no-fault PIP policy. She also claimed to represent the interests of McLaren Oakland hospitals, which had since intervened in the suits. McLaren Oakland filed a proof of claim against the estate of David Duncan on January 8, 2018 in the amount of $153,280.10. Because Lynette Duncan purported to represent the interests of Medicaid, Medicare, and McLaren Oakland in relation to recovery from Liberty Mutual, Liberty Mutual filed in state court on March 28, 2016, prior to removal, a motion to determine proper payees and the appropriate lien holders with respect to Medicare, Medicaid, and intervening plaintiff McLaren Oakland. Its state-court motion listed thirteen medical-services providers who had provided notices to Liberty Mutual. Liberty Mutual further alleged that all those providers had accepted payment in full from Medicare and Medicaid, rather than from Lynette Duncan. Liberty Mutual therefore moved the court to determine which parties were to be reimbursed by Liberty Mutual.

While that motion was pending, the case was removed to the district court. Liberty Mutual then filed in the district court on November 22, 2016 a new motion to determine proper payees and the appropriate lien holders with respect to Medicare, Medicaid, and intervening plaintiff McLaren Oakland.

6

In her reply, Lynette Duncan asserted that under the MSPA, 42 U.S.C. § 1395y(b)(3)(A), she was the proper payee for amounts paid by Medicare for David Duncan's care, and that under Mich. Comp. Laws § 400.106 she was the proper payee for amounts paid by Medicaid for David Duncan's medical expenses arising out of his January 11, 2013 car accident. Lynette Duncan admitted in her reply that she was not the proper payee for the unpaid amounts claimed by McLaren Oakland, which had since intervened in the action. The district court denied Liberty Mutual's motion to determine proper payees and the appropriate lien holders as a request for an advisory opinion.

After Liberty Mutual removed the case to district court and answered the complaint, Lynette Duncan filed a second amended complaint on August 19, 2016, elaborating on the estate's double-damages MSPA claim. The parties then filed cross-motions for summary judgment on the issue of the MSPA claim.

Liberty Mutual argued that it had not failed to provide reimbursement to Medicare for purposes of the double-damages MSPA claim because it had promptly followed statutory and regulatory processes to resolve directly with Medicare the issue of Liberty Mutual's disputed liability for reimbursement, and that Medicare had, at one point, issued to Liberty Mutual a no-interest determination letter. Liberty Mutual also argued that Medicare still had not issued a final-amount demand letter that would have been required to trigger Liberty Mutual's obligation to pay Medicare.

Lynette Duncan, on the other hand, argued that Liberty Mutual was liable for double damages under the MSPA in the amount of $451,336.58, because it had failed to pay Medicare the initial amount stated in CMS's first conditional-payment letter of July 18, 2014, which was $139,448.33. Medicare sent Liberty Mutual over time at least four more conditional-payment

letters listing various non-final amounts. The January 16, 2015 letter itemized $225,668.29 in conditional payments that Medicare had made, which was the highest, but still not final, reimbursement amount requested by Medicare, and which seems to form the basis of Lynette Duncan's alleged amount of conditional payments of $225,668.29 stated in her Second Amended Complaint, giving rise to the double-damages amount of $451,336.58 claimed under the MSPA.

But not all of the $225,668.29 in conditional payments, or of the $671,159.22 in medical charges itemized by CMS in its January 16, 2015 conditional-payment letter, appears to have been related to David Duncan's car accident and no-fault insurance. The varying amounts in CMS's conditional-payment letters appear to reflect a reallocation of David Duncan's medical expenses between those related to the accident, for which Medicare and Medicaid would seek reimbursement from Liberty Mutual, and other medical expenses of David Duncan while he spent almost two years in various medical facilities before he died.

The amount of conditional payments that CMS ultimately submitted to Liberty Mutual for reimbursement on October 26, 2016, after the jury verdict, and confirmed in a February 20, 2018 payment demand letter, was $174,815.20, which Liberty Mutual paid in March 2018, while the estate of David Duncan claimed that Liberty Mutual still owed Medicare $51,255.06 in unreimbursed conditional payments. Even so, these $174,815.20 in conditional payments constituted only a fraction of the total medical charges incurred by David Duncan. On its October 26, 2016 payment summary form, CMS had itemized on twenty-one pages seventy-one medical charges totaling $460,880.70, of which Medicare conditionally paid $174,815.20. These charges of $460,880.70 included $173,461.10 in bills submitted by McLaren Oakland, of which Medicare paid conditionally $58,229.22 subject to reimbursement by Duncan's no-fault insurer. That

$58,229.22 paid to McLaren Oakland was part of the $174,815.20 conditionally paid by Medicare to various medical-services providers for treatment of David Duncan.

Liberty Mutual's state-court motion to determine proper payees and lien holders that was filed on March 28, 2018 (and which was denied as a request for an advisory opinion by the district court after refiling upon removal lists thirteen medical-services providers who submitted notices to Liberty Mutual. Liberty Mutual alleged that all those providers had accepted payment in full from Medicare and Medicaid. That would mean that healthcare providers other than intervenor McLaren Oakland had charged off the difference, and that David Duncan or his estate had paid nothing. McLaren Oakland filed on January 8, 2018 a proof of claim against the estate of David Duncan in the amount of $153,280.10, which approximated the difference between the amount billed by McLaren Oakland for Duncan's treatment, $173,223.10, and the amount previously paid by Liberty Mutual, $20,181, but did not account for $58,229.22 in payments made conditionally to McLaren Oakland by Medicare subject to reimbursement by Liberty Mutual.

Lynette Duncan requested partial summary judgment in her favor against Liberty Mutual for $451,336.58 in double damages under the MSPA, 42 U.S.C. § 1395y(b)(3)(A). She also requested partial summary judgment in her favor against Liberty Mutual in the amount of $89,962.09 for repayment to Medicaid, which corresponded to the amount listed in a May 6, 2015 demand letter that CMS had sent to Liberty Mutual. That amount was paid by the Michigan Department of Health and Human Services Medicaid program, subject to subrogation against Liberty Mutual. After the state-court jury verdict, Liberty Mutual was prepared to repay the

$89,962.09 to the State of Michigan.  Liberty Mutual had confirmed its readiness to the federal court during oral argument on the cross motions for summary judgment on March 9, 2017.[1]

The exact amount billed and paid by any of the parties in relation to David Duncan's accident is unclear.  Contractual damages were not part of the district-court proceedings, and the only judgment entered thus far in state court concerned the limited issue of causation of David Duncan's injuries.  It would appear, however, that Liberty Mutual paid directly to the medical providers at least $20,181 of the $173,223.10 billed by McLaren Oakland; that the Michigan Department of Health and Human Services Medicaid program paid $89,962.09 to the medical providers; that Medicare paid conditionally $174,815.20 to the medical providers, including $58,229.22 to McLaren Oakland; that healthcare providers sought at least $671,159.22 for rendered services, the bulk of which remained unpaid but was also not subject to discernible collection efforts, other than by McLaren Oakland; and that David Duncan and his estate do not allege that they have paid anything, but aver that Medicaid and McLaren Oakland have filed claims against Duncan's estate.  The claims against David Duncan's estate appear to be to secure reimbursement in case the estate should obtain payments from Liberty Mutual, similar to the initial

---

[1] However, it appears that this repayment of $89,962.09 to Medicaid may not have been carried out to date. The Michigan Department of Health and Human Services intervened in the district-court action upon invitation of the district court in February 2017, after its motion to intervene in the state action had been denied without prejudice. Michigan's complaint alleged that David Duncan had been at all relevant times eligible for Michigan's Medicaid benefits and that Michigan's claim had first priority against David Duncan's net recovery from any settlement or judgment in this action. Michigan's motion to intervene was granted by the district court in its March 10, 2017 order granting Liberty Mutual's motion for partial summary judgment and remanding the case to state court. But neither Michigan nor Liberty Mutual has alleged since that Michigan's Medicaid payments were actually reimbursed by Liberty Mutual. Instead, Liberty Mutual disputed in December 2018 in state court on remand whether the medical expenses paid by Medicare and Medicaid were reasonable and necessary, considering that David Duncan was being kept on life support with a serious brain injury and with no meaningful chance of recovery for almost two years until his death from injuries related to his 2013 car accident. The state court ruled that this fact-intensive question needed to be resolved by jury. As of the time of oral argument before this court, the parties were still awaiting state trial on this issue.

payment of $174,815.20 made by Liberty Mutual with a check delivered to Duncan's estate, which was expected to be forwarded to CMS for reimbursement of Medicare's conditional payments. Michigan alleges in particular that its claim for Medicaid payments has first priority against net recovery from any settlement or judgment against Liberty Mutual.

Ultimately, the entire dispute was between medical-services providers, Medicare, Medicaid, and Liberty Mutual, while David Duncan or his estate did not seem to have been asked to cover or reimburse any charges other than to disburse payments obtained from Liberty Mutual for reimbursement of Medicaid and McLaren Oakland. As a consequence, David Duncan's estate did not suffer any financial harm from Liberty Mutual's alleged statutory violation of the MSPA.

At oral argument on the cross-motions for summary judgment, Liberty Mutual additionally raised recent precedent to challenge Lynette Duncan's standing to bring the MSPA double-damages claim, alleging that Lynette Duncan had not shown an injury-in-fact as required to have standing under the MSPA. After oral arguments, the district court ruled from the bench for Liberty Mutual. It characterized the penalty provision as a windfall to Lynette Duncan, which was unjustified because Liberty Mutual had not acted in bad faith in its dealings with Medicare while disputing liability for David Duncan's medical expenses, where questions of causation of his injuries remained and were resolved only at jury trial and only after Medicare had already accepted Liberty Mutual's arguments as to why David Duncan's medical expenses were not covered under his no-fault PIP policy. The following day, on March 10, 2017, the court issued partial summary judgment without an opinion for Liberty Mutual as well as an order remanding the remaining claims to state court and granting a motion to intervene filed by the Michigan Department of Health and Human Services.

Lynette Duncan filed a notice of appeal on April 7, 2017.

On August 16, 2018, this court remanded the case to the district court to analyze the fact-intensive question of standing of Duncan's estate by considering whether Liberty Mutual had injured Duncan's estate by refusing to pay David Duncan's medical expenses and thus triggering Medicare's conditional payments. *See Duncan v. Liberty Mut. Ins. Co.*, 745 F. App'x 575, 578 (6th Cir. 2018).

After supplemental briefing on the issue of standing, on June 25, 2019, the district court issued its opinion and judgment on remand, holding that Lynette Duncan lacked Article III standing to bring a double-damages claim under the MSPA. The district court reasoned that Lynette Duncan had not shown that David Duncan's estate had suffered any injury-in-fact when Liberty Mutual did not pay David Duncan's medical expenses, because those expenses had been paid by Medicare instead, and, after the jury verdict, Liberty Mutual had committed to reimburse Medicare in accordance with its final payment-demand letter. The district court dismissed Lynette Duncan's double-damages claim under the MSPA for lack of jurisdiction because Lynette Duncan lacked standing and, in the alternative, it denied Lynette Duncan's motion for partial summary judgment as to the double-damages claim and granted Liberty Mutual's motion for partial summary judgment on the same claim. The district court reasoned that partial summary judgment for Liberty Mutual was appropriate because Liberty Mutual had not "fail[ed] to provide for primary payment (or appropriate reimbursement)" to Medicare under 42 U.S.C. § 1395y(b)(3)(A), which was necessary to trigger the double-damages provision, since Liberty Mutual had a plausible argument as to why it was not liable under its no-fault policy and had even convinced Medicare to issue a no-liability determination letter. This argument, however, was advanced to CMS prior to the jury verdict.

Lynette Duncan timely filed a notice of appeal on July 22, 2019. She challenges the dismissal of the estate's MSPA claim for lack of standing.

## B. The Medicare Secondary Payer Act

Medicare is a federal program providing health insurance to individuals who are over the age of sixty-five, disabled, or who have end-stage renal disease. 42 U.S.C. § 1395c. Until the introduction of the Medicare Secondary Payer Act, Medicare was the primary payer of medical costs of its insureds, while private insurance provided secondary coverage above and beyond what Medicare would cover. *Osborne v. Metro. Gov't of Nashville & Davidson Cty.*, 935 F.3d 521, 523 (6th Cir. 2019). But in 1980, seeking to reduce Medicare's exploding costs, Congress passed the Medicare Secondary Payer Act, which reversed the roles: now Medicare became the secondary payer, while certain private insurers, called primary plans, became primary payers. *Stalley v. Methodist Healthcare*, 517 F.3d 911, 915 (6th Cir. 2008). "The sole interest of Congress, as far as the [MSP] statute discloses, was to provide that Medicare would not have to pay ahead of private carriers in certain situations." *Baptist Mem'l Hosp. v. Pan Am. Life Ins. Co.*, 45 F.3d 992, 998 (6th Cir. 1995).

The list of what is considered a primary plan was expanded by several amendments to the MSPA, but its current definition includes automobile and no-fault insurance:

> In this subsection, the term "primary plan" means a group health plan or large group health plan, to the extent that clause (i) applies, and a workmen's compensation law or plan, an automobile or liability insurance policy or plan (including a self-insured plan) or no fault insurance, to the extent that clause (ii) applies. An entity that engages in a business, trade, or profession shall be deemed to have a self-insured plan if it carries its own risk (whether by a failure to obtain insurance, or otherwise) in whole or in part.

42 U.S.C. § 1395y(b)(2)(A). The pertinent regulations further specify:

> Primary payer means, when used in the context in which Medicare is the secondary payer, any entity that is or was required or responsible to make payment with

13

respect to an item or service (or any portion thereof) under a primary plan. These entities include, but are not limited to, insurers or self-insurers, third party administrators, and all employers that sponsor or contribute to group health plans or large group health plans.

42 C.F.R. § 411.21. "The primary payer is responsible for paying for the patient's medical treatment; however, if Medicare expects that the primary payer will not pay promptly, then Medicare can make a 'conditional payment' on its behalf and later seek reimbursement." *Bio-Med. Applications of Tenn., Inc. v. Cent. States Se. & Sw. Areas Health & Welfare Fund*, 656 F.3d 277, 281 (6th Cir. 2011).

The MSPA allows the *United States* to bring an action for payment against a primary plan and includes a provision for double damages. 42 U.S.C. § 1395y(b)(2)(B)(iii). The MSPA also creates a *private* cause of action:

There is established a private cause of action for damages (which shall be in an amount double the amount otherwise provided) in the case of a primary plan which fails to provide for primary payment (or appropriate reimbursement) in accordance with paragraphs (1) and (2)(A).

42 U.S.C. § 1395y(b)(3)(A).

Painstakingly parsing through statutory language, *Bio-Medical Applications of Tennessee* explained the meaning of the cryptic private-action provision: "when a primary plan must pay but will not do so promptly, Medicare may make a conditional payment" and "a primary plan is liable under the private cause of action when it discriminates against planholders on the basis of their Medicare eligibility and therefore causes Medicare to step in and (temporarily) foot the bill." *Bio-Med. Applications*, 656 F.3d at 286. But as this court has subsequently clarified, "the Medicare-eligibility requirement in paragraph (1), 'Requirements of group health plans,' applies only to group health plans." *Mich. Spine & Brain Surgeons, PLLC v. State Farm Mut. Auto. Ins. Co.*, 758 F.3d 787, 793 (6th Cir. 2014). Therefore, for non-group health plans, such as no-fault insurers,

14

the element of "discriminat[ion] against planholders on the basis of their Medicare eligibility" is not required to establish liability under the private cause of action. *Ibid*.; *see Bio-Med. Applications*, 656 F.3d at 286. In case of a no-fault insurer such as Liberty Mutual, therefore, "a primary plan is liable under the private cause of action when it . . . causes Medicare to step in and (temporarily) foot the bill." *Bio-Med. Applications*, 656 F.3d at 286; *see also Mich. Spine & Brain Surgeons,* 758 F.3d at 793.

*Bio-Medical Applications* also held that an additional requirement of "demonstrated responsibility" in the MSPA, 42 U.S.C. § 1395y(b)(2)(B)(ii), does not apply to lawsuits brought by private parties under the MSPA's private cause of action, because it applies only to lawsuits against tortfeasors brought by Medicare for reimbursement. *Bio-Med. Applications*, 656 F.3d at 294. It "limit[s] the class of alleged tortfeasors whom Medicare can sue for reimbursement" to "those who have already been adjudged liable (or have entered into a settlement, etc.) for causing harm that led to Medicare expenses." *Ibid*. But the "demonstrated responsibility" requirement does not apply to insurers who have a contractual obligation to pay medical expenses. *Ibid*. "[A]ttempting to apply the 'demonstrated responsibility' provision to lawsuits brought by private parties essentially relegates the private cause of action to a super-judgment enforcement mechanism." *Id*. at 292.

This court has subsequently clarified that the insured have no private cause of action against tortfeasors under the MSPA, because "[i]n the tort context, the Medicare beneficiary's injury will likely have been redressed by a state court judgment, and allowing that same injury in federal court risks turning the MSPA into a super-judgment enforcement mechanism." *Osborne v. Metro. Gov't of Nashville & Davidson Cty*., 935 F.3d 521, 526–27 (6th Cir. 2019). *Osborne* did not address actions brought by third parties such as medical-services providers. *Id*. at 527. It held

instead that Medicare—but not its beneficiary—could bring an action against tortfeasors under the MSPA, as "this reading is consistent with what this court has previously explained was Congress's purpose: Medicare's recovery." *Ibid*.

The double-damages provision of the MSPA is likely to deter the social ill of private insurers trying to shift costs to Medicare, thus functioning much like antitrust laws' treble-damages provisions, but it was included above all to preserve the fiscal integrity of Medicare directly by providing for reimbursements to Medicare for its conditional payments. *Bio-Med. Applications*, 656 F.3d at 295. However, "the double damages" under the MSPA "are not a windfall to the private plaintiff; rather, [the MSPA] contemplates that Medicare will seek reimbursement out of that recovery, so the plaintiff most likely will keep only its half." *Id*. at 294.

The MSPA clarifies the government's subrogation rights: "[t]he United States shall be subrogated (to the extent of payment made under this subchapter for such an item or service) to any right under this subsection of an individual or any other entity to payment with respect to such item or service under a primary plan." 42 U.S.C. § 1395y(b)(2)(B)(iv). The regulations enacted under the MSPA further specify that "CMS has a right of action to recover its payments from any entity, including a beneficiary, provider, supplier, physician, attorney, State agency or private insurer that has received a primary payment." 42 C.F.R. § 411.24(g). So, if a primary payer fulfills its contractual obligation to the beneficiary by disbursing funds to such beneficiary—or to a medical services provider—Medicare's right to reimbursement is subrogated to the beneficiary's right to receive such payments. *Health Ins. Ass'n of Am., Inc. v. Shalala*, 23 F.3d 412, 417–18 (D.C. Cir. 1994). Additionally, "[i]f the beneficiary or other party receives a primary payment, the beneficiary or other party must reimburse Medicare within 60 days." 42 C.F.R. § 411.24(h). But "[i]f the recipient of the third-party payment fails to reimburse Medicare within sixty days, as

16

required under 42 CFR § 411.24(h), then 'the third party payer must reimburse Medicare even though it has already reimbursed the beneficiary or other party.'" *Health Ins. Ass'n of Am., Inc. v. Shalala*, 23 F.3d 412 at 417 (quoting 42 C.F.R. § 411.24(i)(1)). The subrogation provision of 42 U.S.C. § 1395y(b)(2)(B)(iv) additionally ensures that Medicare can recover its conditional payment from the party that received a payment meant for reimbursing Medicare. *See id*. at 417–18. The statute thus makes sure that Medicare is reimbursed by either party. *Ibid*.

For example, the MSPA "empowers healthcare providers to sue private insurers who violate the [MSPA]. It then enables Medicare to pursue its reimbursement out of the proceeds recovered by the victorious healthcare providers." *Bio-Med. Applications*, 656 F.3d at 295; *see also* 42 U.S.C. § 1395y(b)(2)(B)(iii); *Mich. Spine & Brain Surgeons*, 758 F.3d at 788 (holding that the MSPA private cause of action is available to a health-care provider who has not been paid by a primary plan). "Because healthcare providers anticipate that Medicare will seek its reimbursement from the proceeds, however, they must receive a premium over the reimbursement amount to be motivated to bring these lawsuits against private insurers." *Bio-Med. Applications*, 656 F.3d at 296. Furthermore, "providers usually suffer their own injury when private insurers refuse to pay, because providers generally are paid less by Medicare than they would be paid by private insurers." *Id*. at 295–96.

But private parties who are not healthcare providers are also eligible to bring double-damages claims under the private-action provision of the MSPA—so long as they can demonstrate Article III standing. *See Stalley v. Methodist Healthcare*, 517 F.3d 911, 919 (6th Cir. 2008); *Gucwa v. Lawley*, 731 F. App'x 408, 413 (6th Cir. 2018).

## II. ANALYSIS

We have appellate jurisdiction pursuant to 28 U.S.C. § 1291. This court reviews *de novo* a district court's decision to dismiss for lack of subject-matter jurisdiction. *Cartwright v. Garner*, 751 F.3d 752, 760 (6th Cir. 2014). We review a district court's factual findings for clear error, and its application of the law to the facts *de novo*. *Ibid.*

### A. Article III Standing

Liberty Mutual first challenged Lynette Duncan's standing to bring the MSPA double-damages claim during oral arguments in district court on the cross-motions for summary judgment. It alleged that Lynette Duncan had not shown injury-in-fact to establish standing under the MSPA as required by *Gucwa v. Lawley*, No. 15-10815, 2017 WL 282045, at *7 (E.D. Mich. Jan. 23, 2017), *aff'd*, 731 F. App'x 408 (6th Cir. 2018). The district court granted Liberty Mutual's motion for partial summary judgment without an opinion.

On appeal, this court remanded the case to the district court to analyze the fact-intensive issue of Lynette Duncan's standing by answering the question whether David Duncan's estate had suffered an injury when Liberty Mutual refused to pay David Duncan's medical expenses, which were then paid conditionally by Medicare as a secondary payer under the MSPA. *See Duncan v. Liberty Mut. Ins. Co.*, 745 F. App'x 575, 578 (6th Cir. 2018). The district court dismissed Lynette Duncan's MSPA claim for lack of jurisdiction, because it found that Lynette Duncan could not show that the estate had suffered any injury and thus lacked standing. But the district court also granted, in the alternative, Liberty Mutual's motion for partial summary judgment as to the double-damages claim and denied Lynette Duncan's motion for partial summary judgment. The district court thus held for Liberty Mutual both on subject-matter jurisdiction and on the merits.

"Because the standing issue goes to [the c]ourt's subject matter jurisdiction, it can be raised sua sponte." *Loren v. Blue Cross & Blue Shield of Mich.*, 505 F.3d 598, 607 (6th Cir. 2007). Even when a defendant seeks disposition of the case on other grounds, the district court may dismiss for lack of standing. *Kepley v. Lanz*, 715 F.3d 969, 972 (6th Cir. 2013).

"Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (quoting *Ex parte McCardle*, 7 Wall. 506, 514 (1868)).

## 1. Injury-in-Fact

The MSPA is not a *qui tam* statute and private plaintiffs must demonstrate their own Article III standing to assert their claims. *See Stalley v. Methodist Healthcare*, 517 F.3d 911, 919 (6th Cir. 2008) ("We now join all of the other courts that have ruled on the issue and hold that the MSP[A]'s private right of action provision does not transform the MSP[A] into a *qui tam* statute."); *Woods v. Empire Health Choice, Inc.*, 574 F.3d 92, 101 (2d Cir. 2009) (concluding that "42 U.S.C. § 1395y(b)(3)(A) does not create a *qui tam* action, but rather merely enables a private party to bring an action to recover from a private insurer only where that private party has itself suffered an injury because a primary plan has failed to make a required payment to or on behalf of it.").

"Generalizations about standing to sue are largely worthless as such. One generalization is, however, necessary and that is that the question of standing in the federal courts is to be considered in the framework of Article III which restricts judicial power to 'cases' and 'controversies.'" *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 151 (1970).

Federal subject-matter jurisdiction requires the plaintiff to satisfy the following elements of Article III standing:

19

(1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Cleveland Branch NAACP v. City of Parma*, 263 F.3d 513, 523–24 (6th Cir. 2001) (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 180–81 (2000)). Furthermore, "[t]he party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

"A 'concrete' injury must be 'de facto'; that is, it must actually exist"—it must be "'real,' and not 'abstract.'" *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016), *as revised* (May 24, 2016) (citations omitted). "'Concrete' is not, however, necessarily synonymous with 'tangible.'" *Id*. at 1549. The Supreme Court has "confirmed in many of [its] previous cases that intangible injuries can nevertheless be concrete." *Ibid.* ("[T]he violation of a procedural right granted by statute can be sufficient in some circumstances to constitute injury in fact. [A] plaintiff in such a case need not allege any additional harm beyond the one Congress has identified." (citing *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 20–25 (1998); *Pub. Citizen v. Dep't of Justice,* 491 U.S. 440, 449 (1989))). But, as *Spokeo* cautions,

> Congress' role in identifying and elevating intangible harms does not mean that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right. Article III standing requires a concrete injury even in the context of a statutory violation.

*Ibid.  See also Lyshe v. Levy*, 854 F.3d 855, 860 (6th Cir. 2017) (discussing as persuasive *Nicklaw v. Citimortgage*, *Inc.*, 839 F.3d 998, 1002–03 (11th Cir. 2016)) ("[S]tanding is not met simply because a statute creates a legal obligation and allows a private right of action for failing to fulfil this obligation."). For example, a plaintiff "cannot satisfy the demands of Article III by alleging a

bare procedural violation. A violation of one of the [statutory] procedural requirements may result in no harm." *Spokeo*, 136 S. Ct. at 1550.

In *Macy v. GC Services Limited Partnership*, this court clarified the issue of standing in the context of statutory violations:

> *Spokeo* categorized statutory violations as falling into two broad categories: (1) where the violation of a procedural right granted by statute is sufficient in and of itself to constitute concrete injury in fact because Congress conferred the procedural right to protect a plaintiff's concrete interests and the procedural violation presents a material risk of real harm to that concrete interest; and (2) where there is a "bare" procedural violation that does not meet this standard, in which case a plaintiff must allege "additional harm beyond the one Congress has identified."

*Macy v. GC Servs. Ltd. P'ship*, 897 F.3d 747, 756 (6th Cir. 2018) (quoting *Spokeo*, 136 S. Ct. at 1549). In *Macy*, the plaintiffs alleged violations of the Fair Debt Collection Practices Act ("FDCPA") by a debt collector. The *Macy* court concluded that the injury of the plaintiffs fell into the first category, because "the harm Plaintiffs allege—being misled by a debt collector about the rights the FDCPA gives to debtors—is precisely the type of harm—abusive debt-collection practices—the FDCPA was designed to prevent." *Id*. at 760. It therefore held that the plaintiffs "have satisfied the concreteness prong of the injury-in-fact requirement of Article III standing by alleging that [the debt collector's] purported FDCPA violations created a material risk of harm to the interests recognized by Congress in enacting the FDCPA." *Id*. at 761.

However, the MSPA double-damages provision is not designed to protect the interests of the insured; instead, "[t]he sole interest of Congress [in enacting the MSPA] was to provide that Medicare would not have to pay ahead of private carriers in certain situations." *Baptist Mem'l Hosp.*, 45 F.3d at 998. Because the alleged injury to Duncan's estate is not the type of harm that Congress intended to protect through the MSPA, Lynette Duncan needs to fit her claim into the second category of statutory violations under *Spokeo* and *Macy*: "where there is a 'bare' procedural

violation . . . a plaintiff must allege 'additional harm beyond the one Congress has identified.'" *Macy*, 897 F.3d at 756 (quoting *Spokeo*, 136 S. Ct. at 1549).

Not all circuits agree with the injury-in-fact requirement to establish standing in cases involving MSPA's double-damages provisions.

In *Netro v. Greater Baltimore Medical Center, Inc.*, the Fourth Circuit found standing for the purposes of an MSPA claim through calling a plaintiff's injury "a partial assignment of the Government's damages claim." *Netro v. Greater Baltimore Med. Ctr., Inc.*, 891 F.3d 522, 527 (4th Cir. 2018) (quoting *Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 773 (2000)). To arrive at this result, *Netro* analogized to qui tam standing under the False Claims Act discussed in *Stevens*, and concluded that to hold otherwise would deem "Congress [to have] indulged in a patently meaningless act—i.e., of passing a provision with no practical effect, just for the heck of it." *Id*. at 527. *Netro* further explains that "[j]ust as courts should not use their Article III powers to draft an advisory opinion, we should not rush to impute to Congress the drafting of a purely advisory provision." *Ibid*.

Of course, "[c]ourts should not render statutes nugatory through construction." *United States v. Tohono O'Odham Nation*, 563 U.S. 307, 315 (2011). Thus, "[w]e decline to render Congress' decision to include a [private cause of action in the MSPA] nugatory, thereby offending the well-settled rule that all parts of a statute, if possible, are to be given effect." *Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 513 (1981).

But courts need not invent injuries where none exists to preserve the validity of the private-right-of-action provision of the MSPA. We "will not engraft a remedy on a statute, no matter how salutary, that Congress did not intend to provide." *Thompson v. Thompson*, 484 U.S. 174, 187 (1988) (quoting *California v. Sierra Club*, 451 U.S. 287, 297 (1981)).

The MSPA private cause of action is not a nugatory provision. For example, to satisfy the MSPA standing requirement, an insured could show that he suffered injury due to the primary payer's refusal to pay medical costs even though Medicare paid such costs, if the insured wished to be treated by doctors or in facilities that do not accept Medicare patients but would accept beneficiaries of certain primary plans. Or Medicare might not cover a treatment that would be covered by a primary plan, thus leaving the insured with less or lower quality medical care. Even though in these situations the insured's claim against the primary plan would be contractual, it could also grant the insured standing to bring an MSPA claim to enforce Medicare's right to reimbursement, because the insured suffered an independent injury due to Medicare's making conditional payments when the primary plan refused to pay medical costs. The plaintiff could thus attempt to show that "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000) (quoting *Lujan*, 504 U.S. at 560–61).

Additionally, the MSPA private cause of action is available to health-care providers who have not been paid by a primary plan but instead by Medicare as a secondary payer under the MSPA. *Mich. Spine & Brain Surgeons*, 758 F.3d at 788. "[P]roviders usually suffer their own injury when private insurers refuse to pay, because providers generally are paid less by Medicare than they would be paid by private insurers." *Bio-Med. Applications*, 656 F.3d at 295–96. Accordingly, the MSPA "empowers healthcare providers to sue private insurers who violate the [MSPA]. It then enables Medicare to pursue its reimbursement out of the proceeds recovered by

the victorious healthcare providers." *Id.* at 296. MSPA's double-damages provision under private cause of action, 42 U.S.C. § 1395y(b)(3)(A), is therefore not nugatory.

Thus, we disagree with *Netro*'s extending of qui-tam-like standing under a non-qui tam statute, simply by the contrivance of creating a derivative injury by a deemed "partial assignment" of the government's recoupment interest. *See Netro*, 891 F.3d at 527. There is no indication in the statute that Congress intended the MSPA to be interpreted as creating a "partial-assignment" provision solely for the purpose of granting standing to otherwise non-injured private plaintiffs. Of course, an MSPA claim can be contractually assigned. *See MSPA Claims 1, LLC v. Tenet Florida, Inc.*, 918 F.3d 1312 (11th Cir. 2019) (holding that a valid assignment of an MSPA claim bestowed MSPA standing upon the assignee, a Medicare Advantage Organization ("MAO")); *US Fax Law Ctr., Inc. v. iHire, Inc.*, 476 F.3d 1112, 1120 (10th Cir. 2007) ("If a valid assignment confers standing, an invalid assignment defeats standing if the assignee has suffered no injury in fact himself."); *MAO-MSO Recovery II, LLC v. State Farm Mut. Auto. Ins. Co.*, 935 F.3d 573, 581 (7th Cir. 2019) (holding that without a valid assignment of an MSPA claim, a further purported assignment "conveyed nothing, and thus the plaintiffs had no rights to enforce and no standing to sue").

As the dissent in *Netro* points out, all six circuits to address the issue concluded that MSPA is not a qui tam statute and a plaintiff suing under the MSPA sues only to remedy his own injury. *Netro*, 891 F.3d at 534 (Traxler, J., dissenting). To arrive at its partial-assignment construct, the *Netro* majority relied on pre-*Spokeo* caselaw. *Id.* at 535 (Traxler, J., dissenting). But as *Spokeo* cautions, "Article III standing requires a concrete injury even in the context of a statutory violation," some "additional harm beyond the one Congress has identified." *Spokeo,* 136 S. Ct. at 1549. The *Netro* dissent stated that the only circuit to address at the time a fact pattern similar to

*Netro* after *Spokeo* was decided was this court's unpublished opinion in *Gucwa v. Lawley*, 731 F. App'x 408 (6th Cir. 2018). *Netro*, 891 F.3d at 535 (Traxler, J., dissenting). *Gucwa* clarified the requirement of an injury-in-fact to be eligible for double damages under the MSPA. While not controlling, its reasoning is persuasive.

In *Gucwa*, a worker who was injured on the job, Marusza, and his girlfriend, Gucwa, brought an action alleging several state and federal claims, including a double-damages MSPA claim, against the workers' compensation administrator and the doctors who had treated Marusza. *Gucwa*, 731 F. App'x at 410. This court held that the MSPA was not a *qui tam* statute, and that Marusza was required to show that he had suffered injury-in-fact to establish his Article III standing. *Id*. at 413. That Marusza could not do. *Id*. at 414. Marusza did not allege any financial harm from the fact that the workers' compensation administrator at some point denied payment of Marusza's continued medical bills but those bills were paid by Medicare, according to a reduced schedule agreed by providers with Medicare. Marusza attempted to show standing by arguing that under *Stalley*, 517 F.3d at 916, a plaintiff has standing under the MSPA as long as he is a Medicare beneficiary denied coverage by a primary payer. *Ibid*. This court disagreed, pointing out that Marusza misrepresented *Stalley*, where the court held that a "self-appointed bounty hunter" who was not even a Medicare recipient did not have standing under the MSPA. *Ibid.* (quoting *Stalley*, 517 F.3d at 919). The converse, however, was not necessarily true. "[S]uch a holding would be directly at odds with the Supreme Court's rulings in *Lujan*, [504 U.S. 555 (1992)], and *Spokeo*, [136 S. Ct. 1540 (2016)]." *Ibid.* Since Marusza could not show financial harm resulting from his medical bills being paid by Medicare instead of the workers' compensation fund and alleged only that Medicare suffered financial harm, this court found the allegations insufficient to establish Marusza's Article III standing. *Id*. at 415.

Similarly, Lynette Duncan does not allege here that the estate of David Duncan suffered any financial harm when Liberty Mutual did not immediately pay David Duncan's medical costs. The medical costs were paid by Medicare, and the only parties who may have suffered as a result were Medicare—which was promised and eventually received reimbursement of its conditional payments—and Medicaid—which was also promised a reimbursement—as well as medical providers, one of which, McLaren Oakland, intervened to assert its claims on its own behalf. The estate of David Duncan was subject to proofs of claim by Medicaid and McLaren Oakland for Duncan's medical expenses, the reimbursement of which both Medicaid and McLaren Oakland pursued as intervenors in Duncan estate's suit against Liberty Mutual. In other words, Medicaid and McLaren Oakland made a protective filing to ensure disbursement of any funds received by the estate of David Duncan from Liberty Mutual as a reimbursement for Duncan's medical expenses covered by his no-fault insurance. David Duncan's estate does not allege that either Medicaid or McLaren Oakland tried to collect payments directly from the estate nor that the estate could keep any such payments if they occurred.

The estate of David Duncan therefore does not have a redressable injury in this action, because it failed to establish that it suffered any injury, financial or otherwise. For example, Lynette Duncan could have argued that the quality or quantity of medical services that David Duncan received was decreased because it was Medicare, instead of Liberty Mutual, that was paying the bills. But she did not allege that.

If we were to agree with Lynette Duncan's arguments, the result would be to recognize a new kind of injury *per se* caused by a primary insurer's failure to promptly reimburse Medicare's conditional payments under the MSPA. But a plaintiff does not "automatically satisf[y] the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize

that person to sue to vindicate that right." *Spokeo*, 136 S. Ct. at 1549. The MSPA is also not a *qui tam* statute and private plaintiffs must therefore satisfy the Article III standing requirement. *See Stalley*, 517 F.3d at 919. In other words, a private "plaintiff does not satisfy the elements of standing simply by showing that the insurer failed to make payments 'on [his] behalf'; the plaintiff must show that he '[him]self suffered an injury because a primary plan has failed' to pay." *Gucwa*, 731 F. App'x at 414 (quoting *Woods v. Empire Health Choice, Inc.*, 574 F.3d 92, 101 (2d Cir. 2009)).

Furthermore, if we were to agree with Lynette Duncan's interpretation of the MSPA, the result would be that whenever a primary plan invoked process to dispute conditional payments made by Medicare, as invited by CMS conditional payment letters, it would be in violation of the MSPA and subject to double damages under the private cause of action provision. "We think that the words of the [MSPA], fairly read in the light of the purpose, disclosed by its own terms, require no such harsh and incongruous result." *Haggar Co. v. Helvering*, 308 U.S. 389, 395 (1940) (discussing the National Industrial Recovery Act).

## 2. Regulatory Burden

The only statutory harms that Lynette Duncan asserts are a statutory violation and a regulatory burden under 42 C.F.R. § 411.51(a). As explained above, a statutory violation of the MSPA does not bestow Article III standing on a private plaintiff who was not otherwise injured. As for the alleged regulatory burden, the implementing regulation of the MSPA states in relevant part:

> § 411.51 Beneficiary's responsibility with respect to no-fault insurance.
> (a) The beneficiary is responsible for taking whatever action is necessary to obtain any payment that can reasonably be expected under no-fault insurance.
> (b) Except as specified in § 411.53, Medicare does not pay until the beneficiary has exhausted his or her remedies under no-fault insurance.

> (c) Except as specified in § 411.53, Medicare does not pay for services that would have been covered by the no-fault insurance if the beneficiary had filed a proper claim.
>
> (d) However, if a claim is denied for reasons other than not being a proper claim, Medicare pays for the services if they are covered under Medicare.

42 C.F.R. § 411.51. The cross-referenced § 411.53 provides:

> § 411.53 Basis for conditional Medicare payment in no-fault cases.
>
> (a) A conditional Medicare payment may be made in no-fault cases under either of the following circumstances:
>
> > (1) The beneficiary has filed a proper claim for no-fault insurance benefits but the intermediary or carrier determines that the no-fault insurer will not pay promptly for any reason other than the circumstances described in § 411.32(a)(1). This includes cases in which the no-fault insurance carrier has denied the claim.
> >
> > (2) The beneficiary, because of physical or mental incapacity, failed to meet a claim-filing requirement stipulated in the policy.
>
> (b) Any conditional payment that CMS makes is conditioned on reimbursement to CMS in accordance with subpart B of this part.

42 C.F.R. § 411.53. Further, 42 C.F.R. § 411.32(a)(1) includes the following limitation: "Medicare benefits are secondary to benefits payable by a primary payer even if State law or the primary payer states that its benefits are secondary to Medicare benefits or otherwise limits its payments to Medicare beneficiaries."

The term "promptly, when used in connection with primary payments, except as provided in § 411.50, for payments by liability insurers, means payment within 120 days after receipt of the claim." 42 C.F.R. § 411.21. Furthermore, under § 411.50,

> Prompt or promptly, when used in connection with payment by a liability insurer means payment within 120 days after the earlier of the following:
>
> > (1) The date a claim is filed with an insurer or a lien is filed against a potential liability settlement.
> >
> > (2) The date the service was furnished or, in the case of inpatient hospital services, the date of discharge.

42 C.F.R. § 411.50.

Lynette Duncan claims that 42 C.F.R. § 411.51(a) ("The beneficiary is responsible for taking whatever action is necessary to obtain any payment that can reasonably be expected under no-fault insurance") requires her to bring an action against Liberty Mutual and thus incur costs to vindicate Medicare's reimbursement rights as a secondary payer under the MSPA. This reads far too much into the regulation. A more correct reading would be that a Medicare beneficiary with no-fault insurance is required to file a claim for the payment of medical costs with the no-fault insurer first. This is consistent with the status of no-fault insurers as primary payers under the MSPA and is no more burdensome than the regular process of filing a claim with a no-fault insurer when Medicare coverage is not involved. 42 C.F.R. § 411.51(d) then provides that Medicare pays for covered services "if a [no-fault] claim is denied for reasons other than not being a proper claim." Under § 411.53(a)(1), Medicare may make conditional payments if the beneficiary had filed a claim with the no-fault insurer, but the intermediary or carrier determines that the no-fault insurer will not make the payments promptly. That is precisely what happened here.

There is no indication in this clear regulatory framework that a Medicare beneficiary is required to bring suit to compel his no-fault insurer to reimburse Medicare for its conditional payments. Of course, a Medicare recipient may choose to bring an action against a no-fault insurer in hopes of obtaining double damages contemplated under the MSPA. Indeed, this seems to be the case here. The double-damages incentive of the private right of action under the MSPA is meant to protect Medicare's interest and is a legitimate consideration for bringing a suit against recalcitrant primary insurers. *See Baptist Mem'l Hosp.*, 45 F.3d at 998; *Bio-Med. Applications*, 656 F.3d at 295. However, such purported protection of Medicare's interests alone does not suffice to bestow Article III standing on a plaintiff who himself has not suffered any injury-in-fact otherwise. *See Spokeo*, 136 S. Ct. at 1549. "[T]here is no such thing as an anything-hurts-so-long-

as-Congress-says-it-hurts theory of Article III injury." *Huff v. TeleCheck Servs., Inc.*, 923 F.3d 458, 463 (6th Cir. 2019), *cert. denied*, 140 S. Ct. 1117 (2020) (quotation omitted). If the voluntarily incurred expenses of bringing a suit under the MSPA could be used by themselves to show "an invasion of a legally protected interest which is . . . concrete and particularized," *Lujan*, 504 U.S. at 560, this element of Article III standing would always be satisfied by any plaintiff who incurs legal expenses. But "interest in attorney's fees is, of course, insufficient to create an Article III case or controversy where none exists on the merits of the underlying claim." *Lewis v. Cont'l Bank Corp.*, 494 U.S. 472, 480 (1990).

* * *

No discernible regulatory burden was imposed on David Duncan under 42 C.F.R. § 411.51(a), and Lynette Duncan failed to demonstrate otherwise that the estate of David Duncan suffered injury as a result of Liberty Mutual's failure to promptly reimburse Medicare for its conditional payments. Therefore, we hold that Lynette Duncan failed to establish Article III standing to bring a claim under the MSPA.

Although Lynette Duncan purports to find it "awkward" that Liberty Mutual challenged her standing in federal court after it removed the case from state court, the MSPA claim involves federal-question jurisdiction, and Lynette Duncan still needs to establish her Article III standing for her federal claim. *See Lujan v. Defs. of Wildlife*, 504 U.S. at 561; *see also Schueler v. Weintrob*, 105 N.W.2d 42, 48 (Mich. 1960) ("Michigan has, of course, adhered to the rule that a State court is bound by the authoritative holdings of Federal courts upon Federal questions."); *Harper v. Brennan*, 18 N.W.2d 905, 906 (Mich. 1945) ("We have in mind that where federal questions are involved we are bound to follow the prevailing opinions of the United States Supreme Court.").

We therefore hold that the district court properly dismissed Lynette Duncan's MSPA claim for lack of standing, before remanding her remaining claims to state court. Because we hold that Lynette Duncan lacked standing to bring her only claim that would trigger federal jurisdiction under the MSPA, we need not reach the merits of her MSPA claim.

### III.  CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's dismissal of Lynette Duncan's double-damages claim under the MSPA for lack of standing.

**HELENE N. WHITE, Circuit Judge, dissenting in part.**

I respectfully dissent from the majority's determination that Lynette Duncan, as representative of David Duncan's estate, lacks Article III standing to pursue a claim under the Medicare Secondary Payer Act ("MSPA"). And to the extent the majority also holds that Congress did not intend to create a private cause of action under these circumstances, I dissent from that determination as well. I would also reverse the district court's merits determination because it imposes a requirement not found or implied in the statute.

This court has been consistent in its description of the history and purposes of the MSPA, as accurately set forth in Section I.B. of the majority opinion. In an effort to control costs, the MSPA changed Medicare's status from primary payer to secondary payer, but provided that "when a primary plan must pay but will not do so promptly, Medicare may make a conditional payment," *Bio-Med. Applications of Tenn., Inc. v. Cent. States Se. & Sw. Areas Health & Welfare Fund*, 656 F.3d 277, 286 (6th Cir. 2011), and then recover the conditional payment from the primary payer. The MSPA also created a private cause of action for double damages when medical bills are improperly denied by primary payers and instead paid by Medicare. 42 U.S.C. § 1395y(b)(3)(A). In such cases, the government is subrogated to the right of the private party for the recovery of such funds. 42 U.S.C. § 1395y(b)(2)(B)(iv); *Manning v. Utilities Mut. Ins. Co., Inc.*, 254 F.3d 387, 394 (2nd Cir. 2001). The double-damages recovery is not a windfall for the private plaintiff, but rather a necessary incentive for private plaintiffs to pursue enforcement of their rights against primary payers, to the benefit of Medicare. *Bio-Med. Applications*, 656 F.3d at 294–95. Without the availability of double damages in cases like this, where the plaintiff is forced to establish the primary payer's liability through the pursuit of litigation, a private plaintiff might have no incentive to bring the case because Medicare would be entitled to collect the bulk,

if not all, of the recovery through reimbursement. Thus, the double-damage provision simply assures that the victorious plaintiff receives something for her efforts.

It is unclear whether the majority concludes that Duncan's claim does not fall within the private-action provision of the MSPA, or that it does, or might, but nevertheless fails to meet Article III's standing requirements. There is language to support both interpretations. The majority's discussion—in the context of not rendering the provision nugatory—of alternative circumstances in which an insured might have the requisite injury-in-fact to pursue a private action would seem to address the proper construction of the statute, not the constitutional standing issue. Likewise for the majority's discussion of the MSPA's not being a *qui tam* statute. But elsewhere, the majority speaks solely in Article III standing terms. I address both possibilities.

The state lawsuit successfully pursued by Duncan seems to be precisely the type of action contemplated by the MPSA's private-action provision. Although Duncan could have simply accepted that Medicare satisfied the medical bills and confined the state lawsuit to a claim for other items covered by Michigan No-Fault insurance, such as allowable expenses or wage loss, the estate endeavored to establish its entitlement to all the benefits Liberty Mutual had denied. Apparently, as contemplated by the MSPA, Duncan and her attorney were more familiar with the facts of the case and the operation of Michigan's No-Fault law, *see Stalley v. Catholic Health Initiatives*, 509 F.3d 517, 524 (8th Cir. 2007) ("The thinking behind the statute is apparently that . . . the beneficiary can be expected to be more aware than the government of whether other entities may be responsible to pay his expenses . . ."), and believed that Liberty Mutual had wrongfully denied coverage for Duncan's medical bills, shifting responsibility to Medicare. As a result of the lawsuit, Medicare recovered its conditional payments where it otherwise would not have. There is no sound reason for construing the MSPA as excluding all claims by insureds who, like Duncan,

cannot show personal financial harm caused by the primary payer shifting responsibility to Medicare, especially where such harm is likely never to occur.

The majority asserts that its interpretation does not render the MSPA's private cause of action nugatory because under different circumstances an insured might show injury resulting from a primary payer's refusal to pay medical costs. The majority offers the examples of an insured wishing to be treated by doctors or in facilities that do not accept Medicare, and an insured desiring to receive treatments not covered by Medicare that would have been covered by the primary payer. But it is unclear how a patient's desire for treatments that the patient either did not receive, or at the very least Medicare did not pay for, would support a claim for double damages under the MSPA, which, by definition, involves conditional payment by Medicare. Thus, I am not persuaded by the majority's argument that its approach would not render the MSPA's private-action provision nugatory in the case of insureds.

The majority also devotes a significant portion of its analysis to the fact that the MSPA is not a *qui tam* statute. That is correct; the MSPA is not a *qui tam* statute. And for that reason, this court properly dismissed the plaintiff's claim in *Stalley v. Methodist Healthcare* for lack of standing. 517 F.3d 911, 919 (6th Cir. 2008). But the plaintiff in *Stalley v. Methodist* sought to pursue a double-damage claim against tobacco companies for medical expenses paid by Medicare on behalf patients with lung disease. Stalley was not a Medicare beneficiary, was not Medicare eligible, and was not denied coverage for a medical procedure by a primary payer. *Id.* at 916. Therefore, a statute specifically permitting suit in the government's name by a *stranger to the underlying payment dispute*—a *qui tam* statute—would have been necessary for Stalley to have standing. Here, however, Duncan is not a stranger to the underlying payment dispute. Although her claim for double damages under the MSPA is a statutory cause of action, it cannot be divorced

from the alleged improper denial of benefits payable under David Duncan's insurance contract. Recognizing that the MPSA covers double-damage actions brought by insureds against their insurers when they wrongfully deny medical payments does not turn the MPSA into a *qui tam* statute. *See Netro v. Greater Baltimore Med. Ctr., Inc*., 891 F.3d 522, 528 (4th Cir. 2018).

The same lines of reasoning lead me to conclude that Duncan has Article III standing to pursue a claim under the MSPA. The majority supports its decision with the assertion that courts should not "invent injuries where none exist to preserve the validity of the private-right-of-action provision of the MSPA." But we need not invent an injury in this case to find standing—Duncan's loss of the benefit of his bargain with Liberty Mutual is a cognizable injury-in-fact. *Springer v. Cleveland Clinic Emp. Health Plan Total Care*, 900 F.3d 284, 287 (6th Cir. 2018). In that regard, this case is entirely unlike the cases in which this court has found that plaintiffs failed to establish Article III standing for bare procedural violations. *See Soehnlen v. Fleet Owners Ins. Fund*, 844 F.3d 576, 582-583 (6th Cir. 2016) (plaintiff has no standing to bring ERISA claim where plaintiff cannot show that limitations imposed by health plan in and of themselves constitute an "injury"); *Lyshe v. Levy*, 854 F.3d 855, 858-61 (6th Cir. 2017) (plaintiff lacked standing to assert violation of Fair Debt Collection Practices Act because the harm alleged was not concrete or of the kind the FDCPA was designed to prevent); *Hagy v. Demers & Adams*, 882 F.3d 616, 621-23 (6th Cir. 2018) (plaintiff lacked standing for "bare procedural violation" of the FDCPA that did not create risk of double payment, cause anxiety, or lead to any other concrete harm); *Huff v. Telecheck Servs*., 923 F.3d 458, 468 (6th Cir. 2019) (plaintiff who could not establish actual injury or a certainly impending, material risk of harm under Fair Credit Reporting Act lacked standing). Duncan's injury from Liberty Mutual's breach of contract is not a mere creature of statute; it is a true injury in fact.

The only way to get around this is to create a wall between the breach of contract and the statutory claim under the MSPA. But such a wall is artificial and elevates the majority's distaste for statutory claims to a constitutional principal that undermines the will of Congress. The majority offers no case supporting the proposition that Congress may not constitutionally authorize a private plaintiff to recover double damages for breach of contract in order to increase the likelihood that a governmental agency will be reimbursed for conditional payments. I note that *Gucwa v. Lawley*, 731 F. App'x 408 (6th Cir. 2018), which the majority relies on as persuasive, albeit non-binding, authority, is distinguishable in this regard. There, the primary payer was a workers' compensation insurer. The plaintiff's entitlement to workers' compensation benefits in that case was statutory, not contractual, so it could more plausibly be argued that the plaintiff, whose medical expenses were covered by Medicare, suffered a mere procedural violation. Here, Duncan's right to medical benefits was contractual, and the contractual breach supports the private cause of action under the MSPA.

Liberty Mutual had no obligation to Medicare, Medicaid, or McLaren Oakland independent of its relationship to Duncan. Although the MSPA double-damages claim is distinct from the contractual claim that Duncan pursued in the underlying state-court action, the MSPA claim cannot fairly be regarded as entirely independent of Liberty Mutual's contractual obligations to David Duncan.[1] And this court has been clear that an insured's standing to pursue a breach-of-contract action does not depend on a showing of monetary loss flowing from the breach. *Springer*, 900 F.3d

---

[1] It is a separate question, not raised by the parties, whether Duncan should have brought her MSPA claim in the same action in which she brought her contract claim. Had she done so, and had the case been removed at that time, I can only assume that the majority would still hold the MPSA claim subject to dismissal for failure to show monetary damages flowing from Liberty Mutual's denial of liability for medical benefits.

at 287 (6th Cir. 2018) (holding that an insurance beneficiary suffers an injury-in-fact when denied health benefits owed under the plan, without regard to whether the beneficiary suffered out-of-pocket loss).

The majority recognizes that Medicare is subrogated to the beneficiary's right to receive payments from the primary payer, and Medicaid[2] and McLaren Oakland filed claims against Duncan's estate to secure reimbursement from any recovery by the estate from Liberty Mutual. Although these subrogation rights clearly establish the subrogees' standing to intervene in this case, it is not clear why those rights, or the initial payments that created them, negate the Duncan estate's Article III standing to pursue statutory double damages under the MSPA for Liberty Mutual's failure to make timely payment of medical benefits under its contract, given that the MSPA claim provides the recovery from which reimbursement to the subrogees is made feasible. The Duncan estate's failure to receive the benefit of its bargain with Liberty Mutual is the harm underlying both the breach-of-contract and MSPA claims. Although Medicare suffered a financial harm when it conditionally covered David Duncan's medical costs, Medicare did so to alleviate the burden to Duncan and his medical providers from Liberty Mutual's breach of contract. The fact that a third-party, here, Medicare, stepped in to alleviate the harm resulting from the breach of contract does not erase the insured's injury-in-fact. *See Springer*, 900 F.3d at 287–88.

Finally, it is not clear why the majority's proposed hypotheticals establish Article III standing where Duncan falls short. The majority recognizes that "in all these situations the insured's claim against the primary plan would be contractual," but asserts nonetheless that the

---

[2] It appears that both Medicare and Medicaid made payments when Liberty Mutual failed to cover Duncan's medical bills.

hypothetical plaintiffs would have standing because "the insured suffered an independent injury due to Medicare's making conditional payments when the primary plan refused to pay medical costs." However, in the majority's hypotheticals, as here, the underlying injury is not due to Medicare's making conditional payments; rather, it is due to the primary plan's refusal to pay claims in violation of a contract. Although the extent of the harm may be different, these hypothetical plaintiffs all suffer the same underlying injury as the Plaintiff in this action—denial of the benefits owing under their primary plan. The fact that Duncan's injury, like all the hypothetical plaintiffs described in the majority opinion, also supports a claim for breach of contract does not negate her standing to seek double damages under the MSPA.

Turning to the merits determination, although the statute requires that the primary payer's "demonstrated responsibility" for medical expenses be separately established in certain circumstances, specifically in the instance of tortfeasor liability, such a showing is not required when the claim is based on contract. *Bio-Med. Applications*, 656 F.3d at 290–91; 42 C.F.R. § 411.22(b)(3). And nowhere does the MSPA signal that bad faith or unreasonableness is required, or that Medicare must have first demanded reimbursement of the amount sought to be recovered by the private plaintiff. Congress could have so provided, but did not, apparently being more concerned with incentivizing private plaintiffs to recover funds from which to reimburse Medicare for conditional payments that rightfully should have been made by primary payers.

For the foregoing reasons, I would reverse the district court's determinations that Lynette Duncan lacks standing to pursue a claim under the MSPA as the personal representative of David

Duncan's estate[3] and that Liberty Mutual has no liability under the double-damages provision of the MPSA.

---

[3] I note that the Eleventh and Fourth Circuits have held that a Medicare beneficiary has standing to pursue a claim under the MSPA where the beneficiary alleges that the primary payer failed to fulfil its obligation to cover the beneficiary's medical costs and Medicare made conditional payments to cover those costs. *Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364 (11th Cir. 1997) (per curiam) (holding that employees "who have not suffered an injury in that they have been covered by Medicare for the medical care [that] they have received retain a sufficient interest in this action for purposes of the Constitutional 'case or controversy' requirement"); *Netro* 891 F.3d at 526 (holding that a plaintiff suffers a recognizable injury-in-fact where defendant was legally obligated to pay for plaintiff's care and refused to do so). Other circuits have assumed beneficiary standing, while not directly ruling on the issue. *See Woods v. Empire Health Choice, Inc.*, 574 F.3d 92, 97 (2d Cir. 2009) ("Woods's evidence, even if considered, can establish only that he has standing to pursue an action to recover the amounts he alleges to have been improperly paid by Medicare for medical care that he personally received."); *Stalley*, 509 F.3d at 527 ("Congress contemplated that Medicare beneficiaries could recover double damages to vindicate their private rights when their primary payers fail to live up to their obligations, even if Medicare has made a conditional payment of the beneficiaries' expenses."); *Manning v. Utilities Mut. Ins. Co.*, 254 F.3d 387, 394 (2d Cir. 2001) ("The MSP creates a private right of action for individuals whose medical bills are improperly denied by insurers and instead paid by Medicare, and the government is subrogated to the right of the private citizen for the recovery of such funds.") I recognize that all these cases, except *Netro*, were decided before *Spokeo*. Still, the majority cites no case holding that an insured bringing an MSPA double-damages case under these circumstances lacks standing and so creates a circuit split.